WATERMAN, Justice.
A Polk County jury found Jonas Neider-bach guilty of six counts of child endangerment, and the district court imposed a fifty-year prison sentence. The victim is his son, E.N., who was less than seven weeks old when he suffered a broken arm, fifteen rib fractures, and a permanent brain injury over a three-week period. The victim’s mother, Jherica Richardson, pled guilty to child endangerment and is serving a twenty-year prison sentence. Jonas appeals his convictions on numerous grounds. For the reasons that follow, we vacate his convictions as to two counts for the baby’s broken ribs because we find the evidence insufficient. We also find the district court erred in denying Jonas’s motion for an in camera review of Jherica’s mental health records under Iowa Code section 622.10(4) (Supp.2011), a statute we uphold today as constitutional in State v. Thompson, 836 N.W.2d 470, 490 (Iowa 2013). We affirm the district court on all other issues. We remand the case for the district court to perform an in camera review and for further proceedings consistent with this opinion.
I. Background Facts and Proceedings.
“We recite the facts in the light most favorable to the verdict.” State v. Garcia, 616 N.W.2d 594, 595 (Iowa 2000). E.N. was born on May 27, 2009. His parents, Jonas and Jherica, were age twenty at that time and living with Jonas’s parents, Jon and Mary Neiderbach. Although E.N. was full term and appeared healthy overall, he spent the first four days following his birth in the neonatal intensive care unit (NICU) because his physicians feared he may have aspirated fecal matter in útero. In addition to this potentially life-threatening concern, E.N. was born with the umbilical cord wrapped around his neck, exhibit ed tremor activity, and did not feed well. E.N. also tested positive for marijuana at birth, which triggered a notification to the Iowa Department of Human Services (DHS).
The new parents brought baby E.N. home to the Neiderbach residence. In light of the positive marijuana test, DHS provided the family with a visiting nurse who came to the house on a biweekly basis to Check on the baby and to answer questions. E.N. was seen by either the visiting nurse or his pediatrician four times during the first two weeks after he left the hospital and appeared healthy at each visit.
On the evening of June 13, E.N. vomited or coughed up a small amount of blood. The next morning, Jonas and Jherica took him to a clinic. The baby was diagnosed with acid reflux and was prescribed Zan-tac. The visiting nurse came to check in on E.N. three days later, and he appeared normal with the coughing and vomiting of blood resolved.
*188 Five days later, on June 18, E.N. was taken to the hospital again — this time for a broken arm. That morning, Jonas, Jheri-ca, and E.N. returned from Jonas’s paper route with the baby asleep. E.N. awakened crying. Jherica handed him to Jonas and left the room to prepare a bottle. She heard the baby’s cries escalate to a scream and returned to find E.N. lying on the bed with his right arm above his head and his left arm limp beside him. Jonas stood over the baby. Jonas told Jherica that E.N.’s arm became pinned behind his back as Jonas laid him on the bed and that he had heard a pop. Jherica checked whether E.N. could grasp her finger with his hand and found that he could not.
Jonas and Jherica took E.N. to the emergency room where the attending physician determined that the baby had a spiral fracture of his humerus, the upper arm bone. E.N. was hospitalized overnight to be examined for other signs of abuse. The hospital reported the injury to DHS.
DHS notified Detective Tim Tyler of the Des Moines Police Department who came to the hospital with two DHS workers to interview the attending physician, Jonas, and Jherica. Jonas repeated the story he had told Jherica and the doctor. Jonas and Jherica were separately instructed that going forward there would be a safety plan in place under which Jonas would not be allowed alone with E.N.
After his discharge from the hospital on June 19, E.N. was seen by his pediatrician, Dr. Eric Andersen. Aside from his broken arm, E.N. appeared to be in good health. He had gained two pounds since his last visit and remained calm during the examination. Dr. Lynn Lindaman, E.N.’s pediatric orthopedic surgeon, saw E.N. again on June 26 for a follow-up appointment for his broken arm. Dr. Lindaman found E.N.’s arm to be healing in good alignment.
E.N. was next seen by a physician on July 8, when Jonas and Jherica rushed him to the hospital after he stopped breathing. That afternoon, Jonas, Jherica, and E.N. had returned home from errands, including visiting Jonas’s father and Jherica’s mother, Connie Richardson, at work. Jon, Connie, and their coworkers noted E.N. appeared healthy that day. E.N. was sleeping when they returned home; however, he soon awakened crying. Jherica tried to feed the baby, but he was not taking his bottle. Jherica handed E.N. to Jonas while she went outside to smoke a cigarette.
Jherica was outside when she heard E.N.’s crying stop abruptly, within three to five minutes after she had handed the infant to Jonas. As she returned inside, Jonas was walking down the stairs holding E.N. Jonas was crying; E.N. was still. Jonas told Jherica that E.N. had stopped breathing. Jherica noticed a yellowish substance oozing from E.N.’s mouth. Jherica cleared his mouth as best she could, but the baby did not resume breathing. Jherica called her mother to ask what to do and was told to take E.N. to the hospital. Jherica returned to the living room and saw Jonas shaking E.N. while saying, “Why aren’t you f-breathing?” Jherica yelled at Jonas to stop and told him that they should take E.N. to the hospital. Jonas initially refused to go to the hospital, mentioning it was the “third time,” but Jherica convinced him to go together.
Jonas and Jherica strapped E.N. into his car seat and drove to the emergency room at Blank Children’s Hospital. Upon arrival they told Dr. Carlin that E.N. had screamed, started gasping, and then stopped breathing altogether. E.N.’s physicians diagnosed the baby with subdural hematomas on both sides of his brain, fifteen rib fractures (some old and some *189 new), and the broken arm. They also found a hypoxic ischemic injury, which is damage to the brain due to lack of oxygen. Dr. Tracy Ekhardt, E.N.’s pediatric critical care specialist, determined E.N.’s “brain injury was due to a force to his head” and that “[t]he explanation that [she] got from the family was not consistent with the amount of force that would be needed to cause that damage to his head.”
E.N. was hospitalized seven weeks and then was transferred to a nursing home for children with special needs, where he spent the next five months. Jherica’s sister, Shannon Nelson, and Shannon’s husband adopted E.N. in November 2009. E.N. remains unable to move his legs and can only barely move his arms. He can move his head side to side, but cannot hold his head up on his own. E.N. is also unable to communicate verbally, has a feeding tube in his stomach, and a tra-cheostomy tube that requires regular suctioning. Doctors expect no significant improvement in E.N.’s condition.
The State’s initial trial information, filed August 26, charged Jonas and Jherica with eight counts of child endangerment, in violation of Iowa Code section 726.6 (2009), and one count of multiple acts of child endangerment, in violation of section 726.6A. On January 21, 2010, Jherica reached a plea agreement, under which she pled guilty to child endangerment causing serious injury, child endangerment causing bodily injury, and neglect of a dependent person. The plea colloquy shows she admitted to smoking marijuana with the baby in útero, to leaving E.N. alone with Jonas in violation of the safety plan, and to failing to get medical care for E.N. after being told he had broken ribs. Jherica agreed to testify for the State at Jonas’s trial. In exchange, the State agreed to recommend that Jherica receive a total sentence of twenty years in prison.
The State amended its trial information on March 11, to drop Jherica as a codefen-dant and eliminate one count of child endangerment. The jury trial began May 4, 2011. During trial, the State dismissed two more counts. The balance of the case was submitted to the jury on May 18. On May 20, after two days of deliberation, the jury found Jonas guilty on all six remaining counts. The district court sentenced Jonas to fifty years in prison.
Jonas appealed, and we retained his appeal. Additional facts and procedural history will be provided in the discussion of specific issues below.
II. Issues Raised on Appeal.
Jonas raises the following issues on appeal: (1) whether the district court erred by failing to dismiss counts two through six as lesser included offenses of count one pursuant to Iowa Rule of Criminal Procedure 2.6(1) or by failing to grant his motion to sever those counts; (2) whether the district court violated Jonas’s due process rights by refusing to issue a subpoena for Jherica’s mental health records sought as exculpatory evidence under State v. Cashen, 789 N.W.2d 400 (Iowa 2010), and Iowa Code section 622.10(4) (Supp.2011); (3) whether Jonas’s July 8 statement to Detective Kelly acknowledging he shook the baby should have been suppressed because she interfered with his attorney-father’s attempt to represent him; (4) whether the district court abused its discretion by admitting into evidence photographs and video of E.N. taken eighteen months after his injuries; (5) whether the district court erred by allowing expert testimony describing medical studies on shaken-baby injuries with reported confessions by caregivers; (6) whether the district court abused its discretion by limiting the cross- *190 examination of Jherica as to her prior inconsistent statements on mental health treatment; (7) whether the prosecutor misstated expert testimony requiring a new trial; (8) whether the district court erred by submitting the aiding and abetting instruction; (9) whether the weight of the evidence was contrary to the jury’s verdicts on counts three and six; and (10) whether the evidence was sufficient to support the convictions on counts four and five.
III. Scope of Review.
Our review of motions to dismiss is for correction of errors at law. In re Det. of Stenzel, 827 N.W.2d 690, 697 (Iowa 2013). We review a trial court’s denial of a defendant’s motion to sever for abuse of discretion. State v. Elston, 735 N.W.2d 196, 198 (Iowa 2007).
We review constitutional issues de novo. See State v. Pearson, 804 N.W.2d 260, 265 (Iowa 2011) (‘We review de novo a district court’s refusal to suppress statements allegedly made in violation of constitutional safeguards.”); State v. Wells, 738 N.W.2d 214, 218-19 (Iowa 2007) (reviewing de novo defendant’s claim that admission of hearsay testimony violated his Sixth Amendment right to confront a witness against him). Discovery rulings challenged on constitutional grounds are reviewed de novo. Cashen, 789 N.W.2d at 405 (“Because the issues in this case rest on constitutional claims involving Cashen’s due process right to present a defense, our review is de novo.”). Nonconstitutional challenges to discovery rulings are reviewed for abuse of discretion. Id. (“Ordinarily, we review discovery orders for an abuse of discretion.”).
We review the district court’s ev-identiary rulings for abuse of discretion. State v. Huston, 825 N.W.2d 531, 536 (Iowa 2013). “Although we generally review the district court’s admission of hearsay evidence for errors at law, ‘when the basis for admission of hearsay evidence is the expert opinion rule ... we will employ an abuse of discretion standard.’ ” Stenzel, 827 N.W.2d at 697 (quoting Kurth v. Iowa Dep’t of Transp., 628 N.W.2d 1, 5 (Iowa 2001)).
Our review of allegations of prosecutorial misconduct is for abuse of discretion. State v. Krogmann, 804 N.W.2d 518, 523 (Iowa 2011). We review whether there was sufficient evidence to warrant submission of a jury instruction for correction of errors at law. See State v. Smith, 739 N.W.2d 289, 293 (Iowa 2007). We review a district court’s ruling as to whether a verdict was contrary to the weight of the evidence for abuse of discretion. State v. Reeves, 670 N.W.2d 199, 203 (Iowa 2003). We review challenges to the sufficiency of the evidence for correction of errors at law. State v. Hearn, 797 N.W.2d 577, 579 (Iowa 2011).
IV. Dismissal or Severance of Counts Two Through Six Pursuant to Iowa Rule of Criminal Procedure 2.6(1).
A. Motion to Dismiss. Jonas appeals the district court’s denial of his motion to dismiss counts two through six. The State’s amended trial information filed April 29, 2011, charged Jonas with these six counts of child endangerment:
Count 1: Multiple acts of child endangerment in violation of Iowa Code section 726.6A.
Count 2: Child endangerment resulting in a brain injury on July 8, 2009, in violation of Iowa Code section 726.6(1).
Count 3: Child endangerment resulting in a broken arm on June 18, 2009, in violation of Iowa Code section 726.6(1).
*191 Count 4: Child endangerment causing rib fractures from June 17-30, 2009, in violation of Iowa Code section 726.6(1).
Count 5: Child endangerment causing rib fractures from July 1-8, 2009, in violation of Iowa Code section 726.6(1).
Count 6: Child endangerment by willfully depriving a child of health care for fractured ribs between July 2-8, 2009, in violation of Iowa Code section 726.6(1).
Jonas contends the State’s trial information violates Iowa Rule of Criminal Procedure 2.6(1), which states:
Two or more indictable public offenses which arise from the same transaction or occurrence or from two or more transactions or occurrences constituting parts of a common scheme or plan, when alleged and prosecuted contemporaneously, shall be alleged and prosecuted as separate counts in a single complaint, information or indictment, unless, for good cause shown, the trial court in its discretion determines otherwise. Where a public offense carries with it certain lesser included offenses, the latter should not be charged, and it is sufficient to charge that the accused committed the major offense.
Jonas focuses on the last sentence of the rule, which prohibits charging lesser included offenses along with the major offense. Jonas argues the State’s trial information violates this rule because it would be “impossible to commit the greater offense of Child Endangerment under [Iowa Code section] 726.6A ... without also committing the offenses set forth in Counts 2 through 6.” See State v. McNitt, 451 N.W.2d 824, 825 (Iowa 1990) (“A lesser offense is necessarily included in the greater offense if the greater offense cannot be committed without also committing the lesser.”). The State concedes the child endangerment offenses charged in counts two through six are lesser included offenses of the multiple acts of child endangerment charged in count one. See State v. Hickman, 576 N.W.2d 364, 367 n. 1 (Iowa 1998).
The district court, however, reached a different conclusion based on its reading of two decisions by our court of appeals: State v. Flanders, 546 N.W.2d 221 (Iowa Ct.App.1996), and State v. Arends, No. 03-0420, 2004 WL 1159730 (Iowa Ct.App. May 26, 2004) (unpublished opinion). In Flanders, the court of appeals considered whether second-degree sexual abuse was a lesser included offense of first-degree kidnapping. 546 N.W.2d at 224. The defendant had been convicted of one count of second-degree sexual abuse and one count of first-degree kidnapping. Id. The court noted that, although sexual abuse can be a lesser included offense of kidnapping, it may not be in every case. Id. at 224-25. This is because “[t]he lesser-included offense analysis addresses situations where multiple charges apply to a single occurrence. Where the alleged acts occur separately and constitute distinct offenses, there can be no complaint one is a lesser-included offense of the other.” Id. at 224. Thus, if the State alleged the “defendant had committed at least two separate and distinct acts of sexual abuse, and only one of those acts formed the basis for the kidnapping charge,” then only one of the sexual abuse charges would be a lesser included offense of the kidnapping charge. Id. at 225.
The district court seized on this language and Arends, which the district court interpreted to hold that “where defendant was charged with Multiple Acts of Child Endangerment and supporting evidence is presented that a child was injured on at least three separate occasions, the lesser included analysis does not apply.” The district court, however, misapprehended the holding of Arends. The Arends court *192 did not consider whether individual child endangerment counts are lesser included offenses of a charge of multiple acts of child endangerment; rather, that court considered whether “the crime of child endangerment is a lesser included offense of involuntary manslaughter.” 2004 WL 1159730, at *5.
We agree that “[t]he lesser-included offense analysis addresses situations where multiple charges apply to a single occurrence. Where the alleged acts occur separately and constitute distinct offenses, there can be no complaint one is a lesser-included offense of the other.” Flanders, 546 N.W.2d at 224. In the present case, however, the major offense and the lesser included offenses involve overlapping acts.
Section 726.6A provides that a person is guilty of a class “B” felony if that person
engages in a course of conduct including three or more acts of child endangerment as defined in section 726.6 within a period of twelve months involving the same child ..., where one or more of the acts results in a serious injury to the child ... or results in a skeletal injury to a child under the age of four years....
Iowa Code § 726.6A (2009) (emphasis added). Thus, one element of this offense requires the State to prove the defendant committed three or more acts of child endangerment under section 726.6. Although the three or more acts supporting a section 726.6A charge “must be separated by time and place so that each incident is separate and distinct,” State v. Yeo, 659 N.W.2d 544, 550 (Iowa 2003), the individual child endangerment offenses are not also separate and distinct from the multiple-acts offense.
For example, imagine a scenario in which the state charges a defendant with one count of multiple acts of child endangerment and three counts of child endangerment causing a broken arm, broken leg, and a brain injury.[1] The state proves the acts causing the broken arm, broken leg, and brain injury were “separated by time and place so that each incident is separate and distinct.” Although the three lesser offenses are separate and distinct from each other, that does not mean that they are separate and distinct from the multiple-acts offense they support. They, in fact, are not. Under this hypothetical, the state could not prove the defendant committed multiple acts of child endangerment without also proving the defendant committed each of the three counts of child endangerment. See McNitt, 451 N.W.2d at 825 (“A lesser offense is necessarily included in the greater offense if the greater offense cannot be committed without also committing the lesser.”). The same is true in this case.[2] Accordingly, the individual counts of child endangerment alleged in counts two through six are lesser included offenses of the first count’s charge of multiple acts of child endangerment.
*193 Thus, applying the last sentence of rule 2.6(1), the five lesser included offenses alleged in counts two through six should not have been charged because “it [was] sufficient to charge that the accused committed the major offense.” See Iowa R.Crim. P. 2.6(3). In any event, the district court would be required “to instruct the jury, not only as to the public offense charged but as to all lesser offenses of which the accused might be found guilty under the indictment and upon the evidence adduced.” Id. r. 2.6(3).
The State contends to require it to charge a defendant with only the multiple acts of child endangerment would be “cumbersome, confusing, and of no practical value” because
[the court] would have had to instruct the jurors to consider Neiderbach’s guilt under Count 1 — which would require instructions on all the underlying offenses, and would also require jury findings concerning all those offenses. Further, the court would have had to instruct that, if the jurors acquitted Neiderbach under Count 1, they should determine Neiderbach’s guilt of the underlying offenses — which would require the jurors to reconsider issues they already decided.
We fail to see how these practical considerations differ from any other circumstance when a defendant is charged with a major offense and is instructed on lesser included offenses. Taking this case as an example, on count two Jonas was charged with child endangerment causing serious injury in violation of Iowa Code section 726.6(5). The jury was also instructed under count two as to two lesser included offenses — child endangerment causing bodily injury in violation of Iowa Code section 726.6(6) and child endangerment in violation of Iowa Code section 726.6(7). These lesser included offenses would have required the jury to reconsider issues it had already decided in determining whether Jonas was guilty of the major offense— for example, whether he caused E.N.’s injury. This interpretation gives effect to all of the language in rule 2.6(1). Accordingly, we hold the district court erred in not dismissing counts two through six of the trial information as lesser included offenses. Only the major offense under section 726.6A should be charged.
We now turn to consider whether this error prejudiced the defendant. “When a nonconstitutional error is claimed, as in this case, the test is whether the rights of the objecting party have been ‘injuriously affected by the error’ or whether the party has ‘suffered a miscarriage of justice.’” State v. Parker, 747 N.W.2d 196, 209 (Iowa 2008) (quoting State v. Sullivan, 679 N.W.2d 19, 29 (Iowa 2004)). This case involves multiplicity, which is “the charging of a single offense in more than one count.” United States v. Langford, 946 F.2d 798, 802 (11th Cir.1991). Two concerns arise from multiplici-tous counts: “First, the defendant may receive multiple sentences for the same offense. Second, a multiplicitous indictment may improperly prejudice a jury by suggesting that a defendant has committed several crimes — not one.” Id. In Langford, the Eleventh Circuit held a defendant had been charged with multiplicitous counts. Id. at 804. The defendant argued the three counts should be reversed because they had “improperly prejudiced the jury by suggesting that the defendant committed not one but several crimes.” Id. The court, however, emphasized that “[t]he principal danger ... is ... that the defendant may receive multiple sentences for a single offense.” Id. Significantly, the Eleventh Circuit held the defendant had not been prejudiced by the multiplicitous indictment, even though he had actually received sentences on all three counts be *194 cause those sentences were to run concurrently. Id. at 804-05.
We agree that the primary risk of prejudice arising from a multiplicitous indictment is that a defendant could receive multiple sentences for a single offense. In this case, however, no such prejudice resulted because the district court merged his convictions on counts two through six into count one and sentenced him on that one count. Jonas was found guilty of separate acts that were chargeable as separate crimes under section 726.6, but when combined, also violated section 726.6A. Under these circumstances, there was no unfair appearance that he had committed “not one but several crimes.” Accordingly, we hold Jonas was not prejudiced.
B. Motion to Sever. Jonas also appeals the district court’s denial of his motion to sever counts two through six. All the counts involved the same victim and acts occurring within several weeks. A defendant in some circumstances may be entitled to a severance to avoid prejudice from the jury hearing evidence inadmissible on one count coming in to prove another count. That is not the situation here. Count one, which includes counts two through six as lesser included offenses, could not be severed. The State was entitled to offer evidence on each act to prove the multiple-acts crime in count one. Accordingly, we hold the district court did not abuse its discretion in denying Jonas’s motion to sever.
V. The Request for Jherica’s Mental Health Records.
A. Applicability of Section 622.10(4). On July 20, 2010, Jonas filed a motion to compel production of Jherica’s mental health records under the protocol set forth in Cashen. The district court denied Jonas’s motion on the grounds that Cashen only applies when the defendant requests the mental health records of the victim, is claiming self-defense, and is inapplicable to efforts to obtain a codefendant’s mental health records. During the pretrial proceedings in this case, the legislature passed Senate File 291, which took effect upon its enactment on March 30, 2011. See 2011 Iowa Acts ch. 8. Senate File 291 amended section 622.10 by adding the following subsection:
4. a. Except as otherwise provided in this subsection, the confidentiality privilege under this section shall be absolute with regard to a criminal action and this section shall not be construed to authorize or require the disclosure of any privileged records to a defendant in a criminal action unless either of the following occur:
(1) The privilege holder voluntarily waives the confidentiality privilege.
(2) (a) The defendant seeking access to privileged records under this section files a motion demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case. Such a motion shall be filed not later than forty days after arraignment under seal of the court. Failure of the defendant to timely file such a motion constitutes a waiver of the right to seek access to privileged records under this section, but the court, for good cause shown, may grant relief from such waiver.
(b) Upon a showing of a reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source, the court shall conduct an in camera review of such records to *195 determine whether exculpatory information is contained in such records.
(c) If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.
(d) Upon the court’s determination, in writing, that the privileged information sought is exculpatory and that there is a compelling need for such information that outweighs the privacy interests of the privilege holder, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information. The court’s order shall also prohibit any further dissemination of the information to any person, other than the defendant, the defendant’s attorney, and the prosecutor, unless otherwise authorized by the court.
b. Privileged information obtained by any means other than as provided in paragraph “a” shall not be admissible in any criminal action.
Iowa Code § 622.10(4) (Supp.2011).
Jonas renewed his motion seeking Jheri-ca’s mental health records pursuant to the procedure set forth in the statute. The renewed motion included the same offer of proof contained in Jonas’s original motion for production under the Cashen protocol; however, Jonas later supplemented his offer of proof on April 25. The district court again denied Jonas’s motion.
On appeal, Jonas argues section 622.10(4) is unconstitutional because Cash-en set the constitutional floor for requests of mental health records. In Thompson, 836 N.W.2d at 482, decided today, we reject a facial challenge to the constitutionality of section 622.10(4) and hold the statute supersedes the Cashen protocol. We note that, if Jonas’s right to exculpatory evidence trumped the statutory procedure protecting privileged mental health records, as he claims, the same logic would allow Jonas access to Jherica’s privileged communications with her lawyer to see if she admitted guilt in a way that could help establish his innocence. Yet, courts would not allow a codefendant to pierce the attorney-client privilege of another defendant to look for exculpatory evidence. Cf. Wemark v. State, 602 N.W.2d 810, 815-16 (Iowa 1999) (discussing attorney-client privilege in the context of criminal cases, including the general prohibition on the disclosure of client’s confidential communications). Clearly, the legislature is entitled to protect communications between attorneys and clients, just as it may impose procedures governing the disclosure of other records privileged under section 622.10. These privileges serve important purposes that foster and protect necessarily confidential communications. See id. at 815 (noting justification of attorney-client privilege is to encourage “unrestrained communication by clients”); see also McMaster v. Iowa Bd. of Psychology Exam’rs, 509 N.W.2d 754, 758-59 (Iowa 1993) (discussing same purpose for psychotherapist-patient privilege). Accordingly, although Thompson involved the victim’s mental health records and Jherica is a codefendant, we reject Jonas’s constitutional challenge for the same reasons expressed in that opinion. See Thompson, 836 N.W.2d at 481.
Furthermore, because this amendment to the statutory privilege found in section 622.10 is procedural, it applies retroactively. See State v. Godfrey, 775 N.W.2d 723, 724 (Iowa 2009) (per curiam); State ex rel. Leas, 303 N.W.2d 414, 419-20 (Iowa 1981) (applying amendment to statutory physician-patient privilege retroactively as procedural and rejecting argument that amendment changed defendant’s *196 substantive rights in manner precluding retrospective application). In Godfrey, the district court ordered the state to disclose the home addresses of its witnesses in a criminal proceeding. 775 N.W.2d at 724. We granted the state’s application for discretionary review of the pretrial order and transferred the case to the court of appeals, which affirmed the order. Id. We then granted the state’s application for further review, but before deciding the appeal, we adopted Iowa Rule of Criminal Procedure 2.11(12), which governs disclosure of trial witnesses. Id. We noted:
The new provisions do not relate to the substantive elements of the crimes charged, but pertain only to the procedure for adjudicating the criminal charges leveled against a defendant. Consequently, the amendment is applied retrospectively and resolves the dispute raised on appeal.
Id. Similarly, the 2011 amendment to section 622.10 did not change the substantive elements of the criminal charges against Jonas, but rather altered the procedure for seeking records privileged under section 622.10. Although the amendment was enacted after the first ruling denying Jonas access to Jherica’s records, we hold the statute applies retroactively and governs our review of that ruling as well as the subsequent ruling. See id.
Thus, we now turn to consider whether the district court correctly applied the statute in this case.
B. Application of Section 622.10(4). Jonas argued Jherica’s postar-rest behavior provided grounds to compel access to her mental health records. This behavior included her emotionless call to a funeral home to report her son had died and inquire about prices, flashing her breasts in jail, and suggesting she should be in a “psych ward” in July 2009. Jonas also argued his access to her records was supported by her history of smoking marijuana during her pregnancy, her demonstrated pattern of dishonesty, and her admitted frustration while taking care of her newborn son. The State and Jherica resisted.
On April 28, the day after an unreported hearing, the district court denied Jonas’s motion in a ruling filed under seal. The court found that though Jonas had “demonstrated the possibility that [Jheriea]’s mental health records contain exculpatory evidence, the defendant has not demonstrated a reasonable probability that they contain exculpatory information.” The district court noted that because Jherica’s records were “very time and situation limited” they were unlikely to contain exculpatory evidence. Jherica was first diagnosed with depression in her early teens and then was diagnosed again at the jail after E.N.’s injuries. The district court rejected as unpersuasive “the statements, incidents and behaviors” defendant identified in support of his contention that the records would contain exculpatory evidence. The district court also refused to allow defendant to access the records on the basis that there was a “mere possibility that [Jherica] said something to a mental health professional that inculpates herself and exculpates the defendant.” On this point, the court observed, “If that were a ground for permitting disclosure, it would have to be allowed in every case. Clearly, that is not what the legislature intended.”
The district court identified two circumstances particular to this case that lead it to this conclusion: “the defendant already knows much about [Jherica]” and “had access to [her] pre-incarceration medical records.” Finally, the district court concluded Jonas had not established a compelling need for the mental health records because he “already ha[d] information suggesting *197 reasons why [Jherica] might harm the baby and that could suggest she was trying to keep such harm a secret.”
The district court specifically found that Jonas had failed to establish the information sought was not available from any other source:
[G]iven the importance of the privacy interest that is at stake here, and the fact that the statute specifically places the burden on the defendant to show that there is no other source for the information sought, the court does not believe that a defendant is allowed under the statute to obtain another person’s mental health records without first exhausting every other source from which there is a reasonable possibility that the same information could be obtained. At least in this case, there is a reasonable possibility that the defendant could obtain the information he seeks merely by deposing [Jherica], And, even if he cannot do that, there is an equally strong possibility, given the circumstances just discussed, that by taking the deposition he would at least be able to make a stronger case for obtaining her mental health records under the requirements of SF 291.
(Emphasis added.)
On our de novo review, we find the district court erred in failing to conduct an in camera inspection of Jherica’s mental health records. Jherica was a codefendant charged with endangering the same victim, baby E.N. Her credibility was a central issue in the case. Her testimony put E.N. in Jonas’s arms when the baby stopped breathing. She and Jonas concocted matching stories to tell at the hospital, giving a version of what happened that was at odds with the baby’s life-threatening injuries. Jherica also gave inconsistent statements contradicted by her trial testimony. Significantly, she behaved strangely in jail, by stating she should be in “a psych ward,” baring her breasts, and falsely saying her son was dead while asking, without emotion, about burial costs. She pled guilty to three counts of child endangerment, albeit without admitting to personally inflicting the baby’s injuries. Jonas’s defense strategy included raising reasonable doubt whether certain injuries may have been inflicted by Jherica instead of him. The district court made no finding that Jonas’s motion was made in bad faith to intimidate or deter her testimony or for any other improper reason. We conclude Jonas “demonstratefd] in good faith a reasonable probability that the information sought [in Jherica’s records] is likely to contain exculpatory evidence ... and for which there is a compelling need for [Jonas] to present a defense” within the meaning of section 622.10(4)(a )(2)(a).
The district court denied his motion in part because it found Jonas failed to show that “the information is not available from any other source,” as required under the statute. Iowa Code § 622.10(4)(a )(2)(a). Specifically, the district court found Jonas failed to meet this requirement because he failed to depose Jherica. Under the circumstances of this case, we disagree that his failure to depose Jherica was fatal to his motion to obtain her mental health records. Jherica may have made admissions to a mental health counselor that she would forget or deny in an adversarial interrogation. Statements memorialized by a neutral therapist would likely be more credible than Jherica’s self-serving assertions as a hostile witness. Indeed, noted commentators have recognized that “[e]ven the taking of a deposition from a hostile witness may not provide the substantial equivalent of the information the witness has given to a party to whom he or she is not hostile.” Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, 8 *198 Federal Practice and Procedure § 2025, at 544 & n. 23 (3d ed.2010) (citing Fed. R.Civ.P.- 26(b)(3) advisory committee’s note). Her records may very well have enabled defense counsel to more effectively cross-examine her at trial or assisted counsel’s preparation for her deposition.
Accordingly, we reverse the district court’s ruling denying Jonas’s motion for an in camera review of Jherica’s mental health records and remand the case for the district court to conduct that review pursuant to section 622.10(4)(a )(2). If the district court finds no exculpatory evidence on that review, Jonas’s remaining convictions shall remain affirmed. If exculpatory evidence is found, the district court shall proceed as directed in section 622.10(4)(aJ(2)(c) and (d) and determine whether Jonas is entitled to a new trial.[3]
VI. Defendant’s July 8 Statements to Detective Kelly.
A. Facts and Procedural Background. Late in the evening on July 8, the hospital notified Detective Lori Kelly of the Des Moines Police Department that a baby had been brought in with a brain injury. When Detective Kelly arrived at the hospital, she learned that the victim, E.N., “was in very serious condition and may not make it.” Detective Kelly interviewed four people that night: Jon, Mary, Jherica, and Jonas, in that order. Greg Sweem, a DHS on-call worker, and Sergeant Lori Neely were present during all of the interviews.
After Detective Kelly finished interviewing Jherica sometime around 2 a.m., she asked Jonas to join her in a private room for an interview. Jonas agreed and walked towards the room. Jon interjected, “I’m not comfortable with my son, Jonas, being interviewed.” He asked to be present during his son’s interview and told Detective Kelly, “I’m acting as his attorney.” Detective Kelly asked Jon whether he was licensed to practice law in Iowa, and he confirmed that he was. Detective Kelly told Jon it would not be possible for him to sit in on the interview because he was a witness. But, she “told both Jon and Jonas that, of course, [Jonas] was welcome to have any attorney that he wanted ... ‘any attorney in the world except for Jon Neiderbach.’ ” Jonas said nothing during that exchange.
*199 Jon repeated that “he was not comfortable with Jonas being interviewed at 2:00 in the morning.” Detective Kelly explained she only planned to ask Jonas the same questions she had asked him, his wife, and Jherica. Detective Kelly then looked directly at Jonas and said, “It’s up to you whether you speak with us or not. It’s your decision.” At that time, Detective Kelly noted she had “made it clear that his father was not going to be present [for the interview].” Jonas “said he was willing to speak with [them] and followed [them] into the room.”
The interview ended about thirty minutes later when Jon barged into the room, “saying that that was enough, that [they] didn’t need to ask any other questions.” At that time, Detective Kelly and Jonas were discussing whether Jonas had ever shaken E.N., “even if it was an attempt to get him to get his attention or to get him to breathe after he had gone limp.... ” Significantly, Jonas had just answered affirmatively when his father entered the room to end the interview.
On September 1, 2010, Jonas filed a motion to suppress the statements he made during this interview. Jonas claimed Detective Kelly had violated his right to counsel and that her deception as to whether his father could represent him as an attorney rendered his confession involuntary. The district court held a suppression hearing on October 1. Detective Kelly and Jon testified.
Detective Kelly testified that she denied Jon’s request to be present during her interview of Jonas because she considered Jon “a potential suspect, just like everybody else who had been in contact with [E.N.] ” Detective Kelly added:
I knew that was not something that the Court would allow. It was absurd to me that he would be able to represent his son in a case simply because he is also involved. He’s a witness. He’s a potential suspect.
Detective Kelly explained that she considered Jon to be a suspect at that time because “[t]here were four people who lived with the child, who had several injuries, and experience and research shows that most cases involve the caretakers, and Jon was one of them.”
Jonas was not in custody during the interview and was free to leave at any time. No claim is made on appeal that the interview was custodial. Detective Kelly testified that during her interactions with Jonas, he never invoked his right to an attorney or his right to remain silent, and he never asked to end the interview. The interview was not recorded.
Although Jon admitted that he had not been formally retained as an attorney by his son, Jon testified that approximately two and one-half years prior he had represented his son in a criminal matter. Jon also testified that he had recently given Jonas legal advice during the investigation of E.N.’s broken arm.
The district court denied Jonas’s motion to suppress on October 18:
Detective Kelly correctly informed Jon Neiderbach that he could not act as his son’s lawyer during the criminal investigation because Jon was also a suspect, a witness and an employee of the DHS. The Iowa Rules of Professional Conduct prohibit representation where there is a significant risk that the representation will be limited by the personal interest of the attorney. Iowa R. of Profl Conduct § 32:1.7(a)(2); see also Iowa R. of Profl Conduct § 32:3.7 (stating the general prohibition against being an advocate at a trial when the lawyer is likely to be a necessary witness). Jon had a clear conflict of interest as a potential suspect and witness in the case. Since *200 he had not been ruled out as a suspect, Detective Kelly properly determined he could not sit in on the interview of another suspect in the same case.
The district court also found that Detective Kelly informed Jonas that it was his choice whether to speak with her. The district court concluded Jonas “knowingly, voluntarily and intentionally waived his right to remain silent.” The district court also ruled Detective Kelly had not violated Jonas’s right to counsel because that right could only be invoked by Jonas, and thus, “Jon Neiderbach had no standing to assert these rights on behalf of his adult son.” Finally, the district court determined “[t]he police did not knowingly or intentionally frustrate the defendant’s opportunity to meet with an attorney before or during the non-custodial interview at the hospital.”
B. Analysis. Upon our de novo review of the record, we conclude the district court correctly found Jonas’s statement to Detective Kelly was voluntary and that he waived any right to counsel he may have had. Jon was not the right lawyer for his son the night of July 8, 2009. Jon was a witness as one of four adults residing in the home where his grandson, E.N., had been injured repeatedly in recent weeks and that very day. Jon was also a suspect at this initial stage of the investigation. So, too, was Jon’s wife, Mary, the victim’s grandmother. A lawyer who is personally involved as a witness, a closely related family member, and a potential suspect in a matter police are investigating may have conflicting motives to deflect blame. Such a lawyer should not be representing another suspect interviewed by the police. See Iowa R. of Profl Conduct § 32:1.7(a)(2) (“[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest [that] ... exists if ... there is a significant risk that the representation ... will be materially limited ... by a personal interest of the lawyer.”). We need not decide whether Jon was ethically precluded from representing Jonas the night of July 8 because we decide this issue on another ground.
In Johnson v. Zerbst, the United States Supreme Court discussed the test for assessing whether a defendant has waived his constitutional right to an attorney:
“[C]ourts indulge every reasonable presumption against waiver” of fundamental constitutional rights and ... we “do not presume acquiescence in the loss of fundamental rights.” A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.
304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 68 L.Ed. 1461, 1466 (1938) (footnotes omitted); see also State v. Hilpipre, 242 N.W.2d 306, 309 (Iowa 1976) (“It is well settled an individual may legally waive his or her constitutional rights. But the State must prove by a preponderance of evidence such was knowingly, voluntarily and intelligently done.”).
We will first address whether Jonas acted voluntarily in waiving his right to counsel and giving the interview. In State v. Madsen, we applied the totality-of-the-circumstances test to determine whether statements defendant made during a noncustodial interview were voluntary. 813 N.W.2d 714, 722-23 (Iowa 2012). Under this test, “statements are voluntary if the defendant’s will is not overborne or his capacity for self-determination is not critically impaired.” Id. at 722. The fac *201 tors to be considered in determining whether defendant’s statements were voluntary include:
“[Defendant’s age; whether defendant had prior experience in the criminal justice system; ... whether deception was used; whether defendant showed an ability to understand the questions and respond; the length of time defendant was detained and interrogated; defendant’s physical and emotional reaction to interrogation; whether physical punishment, including deprivation of food and sleep, was used.”
Id. at 722-23 (quoting State v. Payton, 481 N.W.2d 325, 328-29 (Iowa 1992)).
At the time of the interview, Jonas, age twenty, was an adult. According to his father’s testimony at the suppression hearing, Jonas had some prior experience with the criminal justice system, although the extent of that experience is not contained within the record. Jonas does not allege Detective Kelly used any deception in taking his statement. Detective Kelly told Jonas he could have “any attorney in the world except for Jon Neiderbach.” Jonas never requested any lawyer, and when told it was his choice whether to give the interview, he chose to proceed.
The interview began at 2 a.m., after Jonas had been at the hospital for about twelve hours under emotionally difficult circumstances with the life of his baby in the balance. Yet, he makes no claim that he was too fatigued to waive any right. The police did not detain him for any period preceding the interview. We conclude that even if Jonas had a right to have Jon represent him that night, Jonas knowingly and voluntarily waived that right and that Jon acquiesced by allowing the interview to proceed without telling Jonas to remain silent or to await the arrival of another lawyer. We also find that Jonas’s statement to Detective Kelly was made voluntarily. Detective Kelly specifically told Jonas, “It’s up to you whether you speak with us or not. It’s your decision.” She said that with Jon present. Jonas chose to proceed without counsel. We affirm the district court’s ruling denying Jonas’s motion to suppress the statement he made to Detective Kelly.
VII. The January 2011 Video and Photograph.
A. Facts and Procedural Background. Jonas moved in limine to exclude from evidence a nearly five-and-a-half minute video and a photograph of E.N. taken in January 2011, eighteen months after he sustained the injuries on July 8, 2009. The DVD shows E.N. having his tracheos-tomy tube cleaned and suctioned. E.N. had several seizures during the video. Jonas argued the video was irrelevant and even if relevant, “its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.” Specifically, Jonas argued “the video is clearly intended to arouse the jury’s sense of horror and provide an instinct to punish.” His appellate brief describes the video as “heart-wrenching.” On April 27, the district court heard argument on the motion in limine. The State argued it intended to offer the video to show “the seriousness of the injuries to [E.N.] and clearly the condition that he was in ... after [those] injuries.”
The court did not rule on the motion before the State sought to admit the photograph and video at trial on May 5. During the State’s direct examination of Shannon regarding E.N.’s current health condition, the district court admitted the video and photograph into evidence over defense counsel’s renewed objection. The video was played for the jury while Shannon answered questions about it. The *202 prosecution did not mention the video during closing arguments.
B. Analysis. We must decide whether the district court abused its discretion by allowing the video and photograph into evidence. See Huston, 825 N.W.2d at 536 (noting evidentiary rulings under Iowa Rule of Evidence 5.403 are reviewed for abuse of discretion). Our court has long recognized photographs are not inadmissible simply because they are “gruesome or may tend to create sympathy ... if there is just reason for their admission.” State v. Hummell, 228 N.W.2d 77, 83 (Iowa 1975); accord State v. Coburn, 315 N.W.2d 742, 746 (Iowa 1982) (affirming ruling allowing into evidence “grisly” photos that were “a fair and accurate depiction” of the child-victim’s condition). “Trial courts have discretion in determining whether the value of pictures as evidence outweighs their grisly nature.” State v. Hickman, 337 N.W.2d 512, 516 (Iowa 1983); see also Iowa R. Evid. 5.403.
We disagree with Jonas’s contention that the January 2011 video and photograph were irrelevant. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Iowa R. Evid. 5.401. The State charged Jonas with child endangerment causing serious injury for the brain injury E.N. sustained on July 8. The State was required to prove beyond a reasonable doubt that E.N. suffered a “serious injury.” See Iowa Code § 726.6(1), (5) (2009). Iowa Code section 702.18 defines a “serious injury,” in part, as a “[b]odily injury which ... [c]auses protracted loss or impairment of the function of any bodily member or organ.” Id. § 702.18(1)(6 )(3). Jonas did not stipulate that E.N. suffered a serious injury. The video and photograph depicted E.N.’s condition before trial and reflected the long-term effects of the injuries E.N. had sustained eighteen months earlier. The video and photograph are relevant to the issue of the victim’s serious injury.
We next consider whether the video and photograph were nonetheless inadmissible under rule 5.403. See State v. Henderson, 696 N.W.2d 5, 10 (Iowa 2005) (“Even relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice.”). To determine whether evidence should be excluded under rule 5.403, we apply a two-part test. Huston, 825 N.W.2d at 537. “First, we ‘consider the probative value of the evidence.’ Second, we balance the probative value ‘“against the danger of its prejudicial or wrongful effect upon the triers of fact.”’” Id. (quoting State v. Cromer, 765 N.W.2d 1, 8 (Iowa 2009)). Evidence is unfairly prejudicial when it
“appeals to the jury’s sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case.”
Henderson, 696 N.W.2d at 10-11 (quoting State v. Plaster, 424 N.W.2d 226, 231 (Iowa 1988)). But, in a sense, all powerful evidence is prejudicial to one side. The key is whether the danger of unfair prejudice substantially outweighs the evidence’s probative value, as we noted in Huston:
[T]he purpose of all evidence is to sway the fact finder. In child abuse cases, much evidence will be at least somewhat prejudicial. Exclusion is required only when evidence is unfairly prejudicial [in a way that] substantially outweighs its probative value. “Unfair prejudice” is the undue tendency to suggest decisions on an improper basis, *203 commonly though not necessarily, an emotional one.
Huston, 825 N.W.2d at 537 (citations and internal quotation marks omitted).
The video of E.N. depicted the ongoing care that he needs and the lasting effects of his injuries. Video evidence is highly effective. “Courts of other jurisdictions have dealt with the issue of the prejudicial nature of day-in-the-life videos and have frequently admitted them into evidence.” Eckman v. Moore, 876 So.2d 975, 983 (Miss.2004). Jonas does not claim the video of E.N. is misleading or deceptive or that it inaccurately depicts E.N.’s condition. See id. at 984 (“In order for the video to have the least amount of prejudicial value, the video must portray ordinary, day-to-day situations.”). Rather, Jonas argues the video was unnecessary and inflamed the jury. The video’s impact on the jury results from the nature of E.N.’s condition, which is fairly depicted. We do not find the video’s probative value is substantially outweighed by unfair prejudice. Just as trial courts have discretion to admit into evidence autopsy or crime scene photographs showing a murder victim, even if the cause of the victim’s death is undisputed, so too may district courts allow video accurately depicting an injured child’s condition, even if other evidence establishes the seriousness of the injury. The prosecution has leeway in what evidence to use to prove injuries, subject to the district court’s discretion under rule 5.403.
In Rodriguez v. State, the Texas Court of Appeals held video of the victim’s current condition was admissible, rejecting the criminal defendant’s challenge under Texas Rule of Evidence 403. 352 S.W.3d 548, 555 (Tex.Ct.App.2011). The appellate court noted the video had “some probative value in showing that [the victim] suffered a serious bodily injury” as was required for the conviction. Id. at 553. The court noted the defendant had not stipulated that the victim’s injuries were serious. Id. Rodriguez, like Jonas, argued the video should have been excluded under rule 403 because medical records and testimony established the requisite serious bodily injury and that the video was cumulative and prejudicial. Id. at 554. The Rodriguez court disagreed, stating, “Despite the existence of other evidence to document [the victim]’s injuries, the recording communicates that [his] injuries were serious in a non-technical way that is capable of being easily understood by laymen.” Id. Moreover, the video “reflected no more than what the jury would see” if the victim had appeared in the courtroom. Id. at 555. The same is true for the video of E.N.
We hold the district court did not abuse its discretion by allowing into evidence the January 2011 video and photograph of E.N.
VIII. Expert Testimony on Shaken Baby Studies with Confessions by Caregivers.
Jonas challenges expert testimony discussing medical journal case studies of documented brain injuries in which caregivers confessed to shaking the infant-victims. Jonas contends the expert testimony violated the Confrontation Clause and rules against hearsay. The testimony of two experts for the State is at issue.
Defense counsel first objected to the testimony of Dr. Wilbur Smith. While explaining the cause of E.N.’s head injuries, Dr. Smith described the historical underpinnings of the acceleration-deceleration theory. One case history discussed a nanny’s admission that she thought it was appropriate to violently shake babies. Jonas’s counsel objected to the statement as hearsay, which should have been excluded from evidence because he did not “have *204 the opportunity to question the nanny to see if it was a coerced interrogation.”
Jonas’s counsel later objected to similar testimony from the State’s expert, Dr. Carole Jenny. Dr. Jenny described a study that compared injuries suffered by children who were known to have been shaken with the injuries of children whose caregivers denied that they had shaken them. Defense counsel objected to the following testimony from Dr. Jenny:
Q. Can you talk to us a little about kind of the type of force or what you might expect to see if you were an independent observer watching this event. A. I can say that people who have seen babies being beaten or shaken report it to be extremely disturbing. There are good reports that have been documented, as well as multiple, multiple confessional' reports of people who have been involved with abusing children and causing head injury.
It is not something that happens in the course of normal parenting. It is not something that is, you know, holding the baby and patting them on the back. It is a violent act as reported by the people who do it and the people who see it.
MR. DICKEY: Your Honor, I will object. That is hearsay.
THE COURT: Overruled.
Q. Doctor, let me ask you this: Have there been published studies, in fact, in the American Academy of Pediatrics dealing or comparing admissions or statements by a perpetrator and the injuries that were seen in those particular cases? A. Yes.
Q. Were those consistent with what those individuals were saying?
MR. DICKEY: Objection, Your Hon- or. This is hearsay. May I approach?
THE COURT: Yes.
(off the record)
THE COURT: The objection is overruled and for the same reasons that similar objection was overruled last week with the Court, of course, permitting the defendant at the break to make whatever record the defendant thinks is appropriate. Mr. Foritano.
MR. FORITANO: Thank you, Your Honor.
Q. Dr. Jenny, I am not sure where I left off. Let me ask you this: Have there been studies comparing statements by perpetrators that discuss the violent shaking and/or shaking and impact, that compare the injuries or looked at the injuries suffered by those infants? A. The most recent study was by Adamsbaum. She looked at 189 cases, I believe, that were adjudicated, that had gone through the courts. There were 28 people who admitted to hurting a child. All of them admitted to shaking. Some of them admitted to impacting the baby as well.
They found that when they compared the injuries in the confession cases with the injuries in cases where people who hadn’t confessed, that they were comparable, the babies were injured in the same way.
Q. We are talking about that same type of acceleration/deceleration injury? A. Well, yes, the injury result, the sub-durals and subarachnoids, the brain damage. It was similar in both groups.
Q. Those were published in journals typically relied on in the medical field? A. That article was published in the journal called Pediatrics, which is the journal of the American Academy of Pediatrics, which is the most prestigious journal in the field of pediatrics in the world.
*205 (Emphasis added.) In overruling Jonas’s objection to the testimony of Drs. Jenny and Smith, the district court stated:
I do not believe that the matters that you are objecting to violate either the hearsay rule or your client’s Sixth Amendment rights. I do not believe they amount to anything that would be considered testimonial. They are matters that experts rely on.
Dr. Smith’s testimony is basically the same as [Dr. Jenny’s] testimony in terms of how they formed opinions about mechanisms of these injuries and so forth.
You are certainly entitled to ask these witnesses whether it is possible that the underlying information that was relied on, such as confessions of individuals about how they treated a child, whether they considered the reliability of those confessions. In other words, did anybody consider whether all of these or some of these confessions were coerced or were not voluntary or whatever.
So I do not believe — beyond that, the matters are general in nature. I mean, they are not testifying about particular incidents that have any relationship to this particular case other than that this is how they studied these type of injuries and their opinions about how they happen.
So I do not believe that this testimony violates, again, either the hearsay rule or your client’s Sixth Amendment right.
(Emphasis added.)
We begin our analysis with Iowa Rule of Evidence 5.703, which we have said allows
an expert [to] base his or her opinion on facts or data that are not admissible in evidence so long as they are “of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.”
Gacke v. Pork Xtra, L.L.C., 684 N.W.2d 168, 182 (Iowa 2004) (quoting Iowa R. Evid. 5.703). We recently noted that “rule 5.703 is intended to give experts appropriate latitude to conduct their work, not to enable parties to shoehorn otherwise inadmissible evidence into the case.” Stenzel, 827 N.W.2d at 705. Dr. Jenny testified that the Adamsbaum study was published in the journal Pediatrics, which she described as the “most prestigious journal in the field of pediatrics in the world.” She identified Pediatrics as a journal “typically relied on in the medical field.” Significantly, however, she never testified that the facts and data in the Adamsbaum study derived from police interrogations were “of a type reasonably relied upon by experts” in her field, as required under rule 5.703. Iowa R. Evid. 5.703; accord Stenzel, 827 N.W.2d at 705 (“Rule 5.703 requires that the facts and data be viewed as reasonably reliable by experts in ‘the particular field.’ ”). Nor does the State claim her testimony regarding the Adamsbaum study was admissible under the learned treatise exception to the hearsay rule. See Iowa R. Evid. 5.803(18). Accordingly, we conclude the district court erred by overruling Jonas’s hearsay objections to the experts’ testimony regarding that study as well as the nanny case study.
Nevertheless, “[w]e only find reversible error when the admission of improper evidence affects a party’s substantial rights.” Stenzel, 827 N.W.2d at 708. “ ‘The admission of hearsay evidence “is presumed to be prejudicial error unless the contrary is affirmatively established.”’” Id. (quoting Gacke, 684 N.W.2d at 183). A lack of prejudice may be established when similar information is properly admitted through another expert witness. See Gacke, 684 N.W.2d at 183. We find that occurred here.
*206 Dr. Smith testified, without objection, as follows:
Q. Can you tell us what that mechanism [of brain injury] is, and then maybe we can talk a little bit more about the studies? A. Sure. I did also misstate. The doctor was Guthkelch, not Geddes, was involved.
But the — there are a number of studies which have evolved to make it clear that severe acceleration of the head, particularly if it is off axis — in other words, instead of being straight back and forth, the head flops from side to side — that that can cause a severe brain injury. Those are mainstream studies which are widely accepted.
[[Image here]]
There have been a number of studies, including one that we did where we looked at Iowa kids with this problem, and we found about half of the time we could find evidence of an impact, half of the time we couldn’t. There probably is some validity to the impact making it even worse, but in my belief you can certainly do it just by straight acceleration/deceleration, shaking the baby with the head off axis.
(Emphasis added.) Dr. Smith thus testified that there are “mainstream studies which are widely accepted” establishing the causation theory that he was advocating. This testimony did not contain any reference to the nanny or the twenty-eight defendants accused of a crime from the Adamsbaum study. Moreover, he testified without objection to a third study — an Iowa study — that showed that impact was not always found in cases involving brain-injured children. Dr. Smith stated that the rapid shaking of a baby’s head causes the blood vessels of the brain to rip, causing subdural hemorrhaging. He further testified that when a baby’s temporal tip is moved back and forth against the skull, the tissue is injured. Dr. Smith testified that E.N. had both of these types of injuries.
Based upon this record, we conclude that there is no reversible error resulting from the admission of Dr. Jenny’s testimony regarding the Adamsbaum study or Dr. Smith’s testimony about the nanny case study. The hearsay testimony was brief, and there was ample, properly admitted evidence from which the jury could conclude that impact was not required to inflict brain injuries.
We next address Jonas’s Confrontation Clause objection under the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution. The threshold question in a Confrontation Clause analysis is whether the evidence is “testimonial.” See Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177, 203 (2004). The Crawford Court held that a statement given by the defendant’s spouse during a police interrogation and read into evidence against him at trial was testimonial. Id. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203 (“Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.”). The State argues that the anecdotal “confessions” in the Adamsbaum study were simply referenced to support expert opinion testimony, not for the truth of the matters asserted. Jonas argues that the case histories with anecdotal confessions referred to by the State’s experts were offered for the “truth” of the proposition that “shaking alone can cause enough force to cause a traumatic brain injury.” Because Jonas lacked the opportunity to cross-examine the persons in the underlying case histories who “confessed” to shaking the babies whose injuries were studied, he argues the *207 Confrontation Clause prohibited expert testimony referring to those studies. Jonas relies on concurring and dissenting opinions in Williams v. Illinois to support his Confrontation Clause claim. 567 U.S. -, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). In Williams, four dissenters and Justice Thomas disagreed that the Confrontation Clause had been avoided because the expert’s testimony regarding the basis of her opinion was offered for a purpose other than the truth of the matter asserted. See id. at -, 132 S.Ct. at 2256-59, 183 L.Ed.2d at 129-33 (Thomas, J., concurring); id. at -, 132 S.Ct. at 2268-70, 183 L.Ed.2d at 142-45 (Kagan, J., dissenting). Because we have concluded above that any error in admitting the testimony regarding the nanny ease study or Adamsbaum study was harmless, we need not decide whether the testimony was offered for its truth or if it would be considered “testimonial” for purposes of the Confrontation Clause.
IX. The Limitation on Cross-Examination.
During the cross-examination of Jherica, defense counsel asked Jherica whether she was under the care of a physician, psychologist, or psychiatrist while she was in jail. Defense counsel sought to impeach Jherica with an inconsistent statement she made to the judge during her guilty plea. The State objected. After hearing Jonas’s offer of proof on the issue, the trial court sustained the State’s objection, stating as follows:
I think the collateralness of it comes in in this sense, that it has only relevance in challenging the witness’s credibility. I think there are limits to what you can do in the way of impeaching witnesses to challenge their credibility.
You can’t find anything that you could then ask a witness about and then prove that she made an inconsistent statement about it at some time in the past.
[[Image here]]
The suggestion of this question, although you could impeach her with her prior inconsistent statement and her guilty plea, comes too close to suggesting that psychiatric issues are a substantive issue in this case. They aren’t.
There has been no foundation laid which would make them an issue. Its probative value, therefore, in — as it reflects on her credibility is outweighed by its potential for prejudice.
[[Image here]]
... I think its probative value in challenging her credibility is limited. Its potential for prejudice is great. And I, therefore, am not going to allow it.
We agree and conclude the district court did not abuse its discretion in limiting the cross-examination of Jherica on this collateral issue.
It is well settled ... the right to impeach by prior inconsistent statements is not without limit. The subject of the inconsistent statement, if it is to be admissible, must be material and not collateral to the facts of the case.
State v. Hill, 243 N.W.2d 567, 571 (Iowa 1976).
X. Alleged Prosecutorial Misconduct.
A. Background Facts and Procedural History. Jonas’s allegation of prosecu-torial misconduct relates to his claim that the prosecutor mischaracterized the testimony of one of his expert witnesses, Dr. Francis Blankenberg. Dr. Blankenberg testified, in relevant part, as follows:
Q. The subdural hematomas and the subarachnoid hematomas are the result of the acceleration and deceleration and the shearing of the bridging veins, *208 right? A. Yes, that is the usual teaching. Yes.
Q. That is the mainstream - A. That is the mainstream opinion, yes.
Q. That is what you observed, right? A. Yes.
Q. When you have that kind of an injury, that sudden deceleration to the brain, that can cause the hypoxic is-chemic injury? A. Not necessarily.
Q. But it certainly could, right? A. There is a big debate about whether that actually can occur as an isolated finding.
The central areas of the brain that are in question that were — that suffered a severe hypoxic injury, that is not typical for child abuse, per se. That is very consistent, however, with complete cessation of blood flow or oxygen for a period of four to five minutes.
[[Image here]]
Q. You can certainly get edema from the acceleration/deceleration injuries, right? A. You wouldn’t expect pure edema. It would have to be some degree of hemorrhage or intraparenchymal and shear injury which is manifested on MR by hemorrhage. And sometimes CTs can be sensitive enough to pick it up, but MR is more sensitive.
Q. Edema is swelling, right? A. Correct.
Q. You get that with acceleration/deceleration injuries, right? A. No. You have to injure the microvasc, which are in myelin fibers. So you have to disrupt different parts of the brain in order to get “edema.” But a lot of it is mostly shearing of white matter and blood vessels inside the brain that has to be occurring first, and then secondarily you get edema.
[[Image here]]
Q. You were also asked about acceleration/deceleration injuries. You use a couple of terms that I think we need to explain. You used the term mass effect. A. Correct. Let’s put it this way: If you have acceleration/deceleration injury— and let’s talk about the brain itself, not the surrounding bridging veins. If you have severe acceleration/deceleration injuries, you tear the white matter tracks up along with the white matter, along with the blood vessels on the white matter tracks, that tends to cause hemorrhage. Sometimes the hemorrhages are not easily seen on CT, though a lot of times they are.
But certainly on MR you would see signs of bleeding on the sequences they provided had they had that kind of injury to the brain itself.
[[Image here]]
Q. You also used — and I don’t know if I am going to pronounce this correctly — intraparenchymal? A. Intraparen-chymal, meaning inside the brain.
Q. Why would that be indicative of acceleration/deceleration? A. If you had intraparenchymal hemorrhages, where the white matter meets the gray matter is a weak area when you are in that particular motion. That is where you get tearing.
Q. Did you observe that on [E.N.]? A. No.
(Emphasis added.) The alleged misrepresentation occurred first during the State’s cross-examination of another of defense counsel’s expert witnesses, Dr. Ronald Us-cinski:
Q. Would it change your opinion at all if Doctor Blankenberg said on Friday that the injuries to [E.N.] were the result of acceleration/deceleration injuries?
MR. DICKEY: Objection, that’s a mischaracterization of Doctor Blanken-berg’s testimony.
*209 THE COURT: Once again, jurors, you are the judges of the facts. You have to remember what other witnesses said so overruled.
A. And your question is again?
Q. My question is would it change your opinion if Doctor Blankenberg testified on Friday that [E.N.] ’s injuries were a result, the subdurals, were a result of an acceleration/deceleration injury? A. Would it change my opinion? No, it wouldn’t change my opinion.
Q. That the subdurals were caused by shearing of the bridging veins. A. Again, it would not change my opinion.
Jonas alleges the prosecutor misrepresented Dr. Blankenberg’s testimony again during closing arguments when he said, “Dr. Blankenberg ... acknowledged that [E.N.J’s injuries were as a result of the acceleration and the deceleration of the brain and causing those bridging veins to sheer.” Defense counsel again objected to the State’s characterization of Dr. Blank-enberg’s testimony. The prosecutor then interjected stating, “That is exactly what he said, and you remember.” The court interrupted, admonishing the jurors that they “are the judges of the facts ... [and] of what the witnesses said.” The prosecutor then said, “You rely on your memories for what his testimony was. That is what he said was the mechanism for those injuries.” Defense counsel did not request a mistrial after the court overruled either of his objections.
B. Analysis.
1. Preservation of error. We first consider the State’s claim that Jonas waived error by failing to request a mistrial after the court overruled his objections. The State relies on two cases: Krogmann, 804 N.W.2d 518, and State v. Dahlstrom, 224 N.W.2d 443 (Iowa 1974). Both cases are distinguishable because, here, the district court overruled the objections by Jonas’s counsel, while in Krogmann and Dahlstrom, the objections were sustained.
In Krogmann, we held defendant did not preserve a claim for prosecutorial misconduct when he failed to move for a mistrial after “the district court sustained the objection and the question was withdrawn.” 804 N.W.2d at 526. This is because “the district court had no reason to believe that [the defendant] wanted anything further done with respect to the prosecutor’s improper question.” Id. That rationale does not apply when the defendant’s objection is overruled. Dahlstrom similarly held error was not preserved when defendant failed to move for a mistrial after the court sustained his objection. 224 N.W.2d at 449. We noted that “it is the duty of the party aggrieved to timely voice objection to give the trial court opportunity to rule on the matter since [it] occupies a position of vantage and [its] conclusion is entitled to much weight.” Id. That duty is satisfied by the objection. A motion for a mistrial would be futile when the district court has overruled the objection to the statements giving rise to the grounds for a mistrial.
Our court has previously held that defense counsel need not move for a mistrial to preserve error on a claim of prosecuto-rial misconduct when “he promptly objected to the [prosecutor’s] statement ... [and] [t]he objection was overruled.” State v. Phillips, 226 N.W.2d 16, 19 (Iowa 1975). Phillips is controlling here. Counsel need not move for a mistrial after an objection to the misstatement is overruled. Accordingly, we hold error was preserved in this case.
2. Merits. “To prevail on a claim of prosecutorial misconduct, the defendant must show both the misconduct and resulting prejudice.” Krogmann, 804 N.W.2d at 526. In assessing whether re *210 trial is warranted when prosecutorial misconduct is alleged, we consider the following:
“‘(1) the severity and pervasiveness of misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State’s evidence; (4) the use of cautionary instructions or other curative measures; (5) the extent to which the defense invited the misconduct.’ ”
Id. (quoting State v. Boggs, 741 N.W.2d 492, 508-09 (Iowa 2007)). Of these factors, the most important factor we consider is the strength of the State’s evidence. Id. Although prejudice may result from an isolated incident of prosecutorial misconduct, “‘[o]rdinarily a finding of prejudice results from [pjersistent efforts to inject prejudicial matter before the jury.’” Id. (quoting State v. Webb, 244 N.W.2d 332, 333 (Iowa 1976)).
The State on appeal does not argue that the prosecutor correctly characterized Dr. Blankenberg’s testimony, but does argue lack of prejudice. The district court made no finding that the prosecutor mischarac-terized the expert testimony and indeed overruled the objections of defense counsel who argued the testimony was miseharac-terized. We affirm the district court on grounds that Jonas failed to meet his burden to show prejudice requiring a new trial. Several experts affirmatively testified E.N.’s brain injuries were consistent with either an impact or acceleration-deceleration mechanism. The jury heard the testimony of all the experts. The jury also heard defense counsel’s objection during the cross-examination. The prosecutor’s closing argument again drew an objection, and the court admonished the jurors to rely on their own recollection of the testimony. The jury was also instructed that what lawyers argue is not evidence. Prosecutors who misstate testimony risk harming their own credibility with the jury. Cf. Krogmann, 804 N.W.2d at 526-27 & n. 10 (observing prosecutor’s inappropriate comment was just as likely to offend the jury rather than score points for the state). We admonish all trial counsel to scrupulously avoid misstating or embellishing expert testimony on medical causation issues.
Yet, the district court was better positioned than an appellate court reviewing a cold transcript to determine whether any misstatements by the prosecutor prejudiced the defendant:
It is axiomatic that a trial court is better equipped than appellate courts can be to determine whether prejudice occurs. This is because the trial court is a firsthand observer of both the alleged misconduct and any jury reaction to it.
State v. Anderson, 448 N.W.2d 32, 34 (Iowa 1989). Jonas has cited no case on point holding a new trial was required because the prosecutor misstated an expert’s testimony. Accordingly, we hold that the district court did not abuse its discretion by denying Jonas a new trial on this issue.
XL Aiding and Abetting and Alternative-Theory Jury Instructions.
Jonas appeals the trial court’s submission of aiding and abetting instructions on counts one, two, and five. Jonas also appeals the trial court’s submission of the alternative-theory jury instruction, which allowed the jury to convict even if the jurors did not agree as to whether Jonas acted as a principal or as an aider or abettor. Jonas contends the evidence was insufficient to submit those instructions. We only address whether the court properly submitted these instructions as to counts one and two, however, because as is discussed in division XIII of this opinion, *211 we hold the evidence insufficient to support count five.
It is well established that
“[t]o sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission.”
State v. Spates, 779 N.W.2d 770, 780 (Iowa 2010) (quoting State v. Tangie, 616 N.W.2d 564, 574 (Iowa 2000)). The State may prove the defendant participated in the crime by either direct or circumstantial evidence. Hearn, 797 N.W.2d at 580. “‘Knowledge is essential; however, neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting.’” Id. (quoting State v. Barnes, 204 N.W.2d 827, 828 (Iowa 1972)). We have previously held that “ ‘[e]vidence of a defendant’s presence, companionship, and conduct before and after the offense is committed may be enough from which to infer a defendant’s participation in the crime.’” Id. at 581 (quoting State v. Lewis, 514 N.W.2d 63, 66 (Iowa 1994)).
On July 8, the day E.N. suffered his brain injury, two people were in the Neid-erbach home — Jonas and Jherica. Initially, Jherica told the hospital physician, her mother, Jonas’s mother, and Detective Kelly that she was in the room with Jonas when E.N. stopped breathing. Jonas and Jherica told a mutually consistent story that failed to explain E.N.’s injuries: E.N. screamed, started gasping, and then turned blue. Jherica later recanted this story and testified that Jonas was alone with E.N. when he stopped breathing. Jherica also told detectives she may have shaken E.N. after he stopped breathing, but later testified she never shook E.N. “ ‘[T]he jury [is] free to reject certain evidence, and credit other evidence.’” State v. Sanford, 814 N.W.2d 611, 615 (Iowa 2012) (quoting State v. Nitcher, 720 N.W.2d 547, 556 (Iowa 2006)). Given the evidence that Jonas and Jherica were both present when the offense was committed and that they colluded with each other to explain E.N.’s condition, a reasonable jury could have concluded that Jonas aided and abetted Jherica in committing an act that resulted in E.N.’s brain injury. Accordingly, the court’s submission of the aiding and abetting instruction and alternative-theory instruction for counts one and two are affirmed. For the reasons discussed in division XIII of this opinion, we hold the court erred in giving the instruction as to count five.
XII. Weight of the Evidence.
Jonas also appeals the district court’s denial of the part of his motion for a new trial that alleged the verdicts on counts three and six were contrary to the weight of the evidence presented at trial.[4] We accord the district court “broad discretion in ruling on a motion for new trial.” Reeves, 670 N.W.2d at 202. We reverse the district court only if it has abused its discretion. Id. In Reeves, we stated:
On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence. [Commonwealth v.] Widmer, 560 Pa. 308, 744 A.2d [745,] 753 [(Pa.2000)]; see also United States v. Ashworth, 836 F.2d 260, 266 (6th Cir.1988) (appellate court neither sits to judge credibility of witnesses *212 nor to reweigh the evidence; rather appellate court is limited to examining the evidence produced at trial to determine whether the district court’s determination that the evidence does or does not “preponderate heavily against the verdict” is a clear and manifest abuse of discretion).
Id. at 203. For each challenged count, we summarize the evidence presented and analyze whether the district court abused its discretion in determining that the evidence does not preponderate heavily against the verdict.
A. Count Three — Broken Arm.
1. Summary of testimony. Jonas and Jherica took E.N. to the emergency room on June 18 for what turned out to be a broken arm. Dr. Selover, the treating pediatrician, recounted Jonas’s version of how the injury occurred as follows:
Father related a history that the baby was hungry and was crying. He was sitting on a bed holding the baby. Mother went to another room to make a bottle for the baby.
While waiting for Mom to make the bottle, the baby was still crying. Dad set the baby down onto the bed. At the time he set the baby on the bed, he related that he heard a “snap,” the baby cried harder, and he discovered that there was an injury to the baby.
[[Image here]]
... Father said that the baby put his arm behind his back as he set the child down onto the bed.
Several other witnesses testified Jonas told them a similar story.
Although none of the State’s physician witnesses were willing to rule out the 'possibility that E.N.’s arm had been broken in the manner Jonas described, they all agreed that his version was highly unlikely. Dr. Smith, an expert witness for the State, emphasized that “[i]t would be so unusual you could probably publish it as a case report because it is not — certainly would be at variance with most thoughts and practices.”
According to Dr. Selover, a spiral fracture resulting from setting a baby down on a bed was unlikely, in part, because
[a] normal, healthy newborn, when you lie them down or if you lower their head, will elicit something called a Moro response. It is a primitive reflex where the baby’s arms will come up in front of the baby. The legs will come as well.
Also, a normal newborn, their muscle tone is such that they hold them arms and their legs in front of them. They don’t put their arms behind their back.
Dr. Lindaman and the State’s two expert witnesses — Dr. Smith and Dr. Jenny— also testified that E.N.’s Moro reflex and flexor tone made it unlikely his arm would have been behind his back when Jonas placed him on the bed. Dr. Selover further disputed Jonas’s account, noting it was “unlikely that the baby’s weight alone would provide sufficient force to fracture the baby’s arm.” This testimony was buttressed by Dr. Smith, who noted that “[t]he humerus is a fairly strong bone.... It takes a good amount of force to break that.” Dr. Jenny agreed that there would need to be “a significant degree of force involved.”
When asked what the mechanism of injury would be for a spiral fracture in an infant, Dr. Smith testified:
Usually, a twisting, wrenching force. But it is possible somebody could hit the child in the arm; or it is possible, I guess, that a child might be caught, like between a car or some — you know, some hard surface and be pinned and fracture.
The spiral fracture classically is a twist fracture. But there is some pretty *213 good work in the orthopedic literature that follows the stress lines and shows that you can do it with impact too. It is just less likely, considerably less likely, with impact.
[[Image here]]
... Usually, it is grabbing more at the elbow and twisting or wrenching, pulling out or in — I can’t tell which — the arm. It takes a lot of force.
Dr. Lindaman acknowledged he had advised E.N.’s other physicians and DHS that he believed E.N.’s injury was “consistent with the history they had obtained and the one [he] had obtained.” He explained, however, that at that time he was unaware flexor tone would still be present at E.N.’s age. At trial, Dr. Lindaman testified that, in his opinion, Jonas’s version was unlikely because [E.N.] ’s flexor tone would keep his arms in front, not behind him.
Jonas also called two expert witnesses, Dr. Blankenberg and Dr. Errol Mortimer, who testified about E.N.’s broken arm. They agreed it was possible for a spiral fracture to result from an arm being pinned while an infant is laid on his back. Dr. Mortimer further testified his opinion would be unaffected by the fact that a child of E.N.’s age would exhibit the Moro reflex and flexor tone because they “really only appl[y] to [children] when they are startled or when they are moved in a particular way.”
While cross-examining Dr. Selover and Dr. Jenny, defense counsel also introduced into evidence two photographs showing E.N. being held with his arm dangling behind his back. Defense counsel presented Dr. Selover with the first photograph, which he agreed did not show “a good example of flexor muscle tone.” On redirect, however, Dr. Selover noted that it appeared E.N. was sleeping in the photograph, which was significant because “[a] sleeping baby[’s muscles] will, of course, be relaxed ... [whereas in] [a]n awake baby, the muscles are active, engaged.” Defense counsel confronted Dr. Jenny with the second photograph, which showed E.N. being held by his grandmother. Dr. Jenny admitted E.N. was “not exhibiting flexor tone at that point.” But, Dr. Jenny reiterated that an infant who was being laid down, as opposed to being held as was depicted in the photograph, would exhibit the Moro response and flexor tone and thus would lift his arms up in front of him.
2. Analysis. Jonas argues the weight of the evidence presented does not support his conviction for child endangerment under the third count. The jury instruction read as follows:
1. On or about June 18, 2009 the defendant:
a. knowingly acted in a manner that created a substantial risk to E.N.’s physical health or safety; or
b. by an intentional act or series of intentional acts, used unreasonable force: (i) that resulted in E.N. suffering a broken arm; or (ii) with the specific intent of causing a serious injury to E.N.
2. When he committed the act(s) the defendant was E.N.’s parent.
8. As a result of the defendant’s acts, E.N. suffered a serious injury.
Jonas’s challenge focuses on the first element of the instruction. Jonas argues the State failed to rebut his version of how E.N.’s arm was broken, given that he consistently provided the same explanation for the injury to several people and Dr. Linda-man testified that it was possible for E.N. to have suffered a spiral fracture had his arm been pinned behind his back, as Jonas described. Jonas also claims the two photos of E.N. showing his arm “dangling to the side and down below his back” “flatly *214 refuted” the State’s expert testimony that Jonas’s story was inconsistent with the involuntary physical responses of an infant E.N.’s age. Finally, Jonas emphasizes that “the prosecution never offered any alternative explanation for the injury.” We disagree.
The jury heard from four physicians who testified that the presence of flexor tone and the Moro reflex in an infant E.N.’s age substantially undermined Jonas’s explanation for the cause of E.N.’s broken arm because it made it unlikely E.N.’s arm would have been behind his back when he was laid down on the bed. Dr. Smith, Dr. Selover, and Dr. Jenny also testified that it would have taken a great deal of force to break E.N.’s arm. And, contrary to Jonas’s assertion on appeal, the State’s expert witness, Dr. Smith, described the mechanisms that usually cause spiral fractures in an infant’s arm — one of which was “grabbing [E.N.’s arm] ... at the elbow and twisting or wrenching.” Considering all of the evidence in the record, we cannot say the evidence preponderates heavily against the jury’s verdict finding Jonas guilty of child endangerment causing serious injury under this count.
Accordingly, we hold the district court did not abuse its discretion in denying Jonas’s motion for a new trial on count three.
B. Count Six — Failure to Seek Medical Care.
1. Summary of testimony. Jherica’s sister, Shannon, testified that when Jonas and Jheriea dropped E.N. off at her house to have her watch him for the day on July 2 she noticed a popping on E.N.’s back:
It was just — it almost was like a joint popping, like if you would kind of pop a knuckle, how that would feel, kind of popping in and out of place. It was every time he would exhale — or every time he would take a breath. Every inhale and exhale it would just go “pop, pop” with that.
Shannon noted that E.N. “seemed to have some discomfort with it.” Shannon testified she and Joe, Shannon’s cousin who first noticed the issue, told Jonas and Jheriea about the popping before they left for Jherica’s appointment in Iowa City. Shannon recommended they bring it to the attention of E.N.’s pediatrician at his next doctor’s appointment, which Shannon believed was in a couple of days. According to Jherica’s testimony, that appointment was set for some time after July 8. E.N. was not seen by any medical professionals after Shannon raised the issue with Jonas and Jheriea on July 2 until he was rushed to the emergency room on July 8.
Jheriea testified at trial that her cousin “Joe said that it felt like it was a broken rib.” On cross-examination, defense counsel impeached Jheriea with the following statement made in her proffer for her guilty plea: “He told us there was something wrong, but I didn’t know it was broken ribs.” To which Jheriea responded, “He told us that there was something wrong and it felt like broken ribs.” Defense counsel then pointed out that Jheriea had affirmatively denied that she was told the popping was from a broken rib:
Q. When you were asked: Question: “And they say — Joe says, I have had a broken rib and that baby is in pain. And when Shannon and Joe” — you interrupt, don’t you? A. Yes.
Q. What do you say? A. I said, “They did not say this was what it was while I was there.”
Defense counsel also asked Jheriea about a conversation she had with her mother while she was in jail. Jheriea admitted that she had told her mother that if she had known that E.N.’s rib was broken that *215 she would have taken him to the hospital. Joe did not testify at trial.
The day after E.N. was at Shannon’s, Jonas and Jherica left E.N. with Jherica’s mother, Connie. E.N. became so fussy during this visit that Connie had to return him to his parents at the Neiderbach home. Connie noted that E.N.’s crying was “[pjretty much constant” and was not alleviated by feeding him, changing his diaper, or her attempts at consoling him. While Jonas’s mother, Mary, was watching E.N., after Connie returned him to the Neiderbach home, she noticed a popping in E.N.’s back. Connie had alerted her to it when she dropped E.N. off at her home. Mary testified she did not believe the popping was causing E.N. any pain and she was unaware E.N.’s ribs were broken at that time. Jon noticed clicking in E.N.’s back a couple of days later on July 5. He brought it up to Mary, and they generally agreed that the issue should be raised at E.N.’s next appointment with his pediatrician, which was scheduled for later that week.
Dr. Ekhardt, one of the physicians treating E.N. at Blank Children’s Hospital, admitted that “[t]here is no treatment for broken ribs”; however, she explained the treating physician “would have given pain medicine because it is painful ... and [would] follow him to make sure it healed well.” Dr. Ekhardt also testified that to her knowledge E.N. had not suffered a secondary injury from the broken ribs, such as a punctured lung. Dr. Lindaman testified an infant would show signs of distress or pain after suffering multiple rib fractures “for the better part of the day and any other time that those multiple rib fractures were moved.”
2. Analysis. Jonas claims the verdict as to count six, which charged Jonas with child endangerment for failing to seek medical care for E.N.’s broken ribs, is contrary to the weight of the evidence. The jury instruction for this count required the State to prove the following:
1. On or about between approximately July 2, 2009 and July 8, 2009 the defendant deprived E.N. of health care by willfully failing to take him for treatment of broken ribs.
2. At that time the defendant was E.N.’s parent.
3. At that time the defendant was reasonably able to make provisions for E.N.’s health care.
4. The deprivation of such health care caused substantial harm to E.N.’s physical health.
5. As a result of the deprivation, E.N. suffered a bodily injury other than the injury for which the health care was needed.
The jury instructions defined “bodily injury” as “physical pain, illness or any impairment of physical condition.”
Jonas contends the weight of the evidence fails to establish he knew or should have known E.N.’s ribs were broken and, thus, needed medical care. Rather, Jonas argues the evidence merely “showed an awareness of a ‘popping1 feel in E.N.’s back ... which his sister-in-law advised needed to be checked out.” This same popping or clicking was also noticed by Connie, Jon, and Mary — none of whom believed the issue required immediate medical attention. Jonas thus argues:
If the grandparents, who collectively have over one hundred years of experience raising children, did not believe [E.N.] was ever in need of medical care, then how could Jonas — who had only been a father for just over a month— possibly be expected to have known[?]
Yet, Jherica testified at trial that Joe told her and Jonas that he believed E.N.’s ribs were broken. Although Shannon tes *216 tified that she and Joe were less specific on this point, it is not our role to judge the credibility of witnesses on our appellate review. See Reeves, 670 N.W.2d at 203. Rather, we only consider “whether the district court’s determination that the evidence ... does not ‘preponderate heavily against the verdict’ [was] a clear and manifest abuse of discretion.” Id. (quoting Ashworth, 836 F.2d at 266). We cannot say the evidence preponderated heavily against the conclusion that Jonas knew or should have known E.N.’s ribs were broken and the baby was in need of medical attention.
Jonas also argues the weight of the evidence was contrary to the verdict under this count because there is no treatment for broken ribs and because there was no evidence that “[a]s a result of the deprivation, E.N. suffered a bodily injury other than the injury for which the health care was needed.” Jonas also contends there is no evidence E.N. suffered “a separate and subsequent serious injury,” and the State failed to prove “[E.N.] was ever in a state of pain for which [Jonas] either directly or aided and abetted in denying him medication.”
Significantly, however, Dr. Ekhardt testified that although there is no treatment for broken ribs, E.N. still should have been brought in to see a physician so that the healing of his ribs could be monitored and pain medication could be prescribed. The fact that severe pain from the untreated rib injuries could have been alleviated by medical intervention and medication is enough to support a conviction. See State v. McKee, 312 N.W.2d 907, 913 (Iowa 1981) (adopting the Model Penal Code definition of bodily injury). Connie testified that E.N. was so inconsolable the night he was with her that she was forced to return him to the Neiderbach household, even though she tried feeding him and changing his diaper. A reasonable jury could have inferred from the evidence that broken ribs caused the baby’s pain.
Considering all of the evidence in the record, we cannot say the evidence preponderates heavily against the jury’s verdict finding Jonas guilty of child endangerment for failing to seek medical care for E.N.’s broken ribs.
Accordingly, we hold the district court did not abuse its discretion in denying Jonas’s motion for a new trial on count six.
XIII. Sufficiency of the Evidence.
Jonas contends the evidence supporting counts four and five relating to E.N.’s broken ribs was insufficient. For these challenged counts, we summarize the evidence presented and analyze whether it was sufficient to sustain his conviction under each count.
When we review a challenge to the sufficiency of the evidence supporting a guilty verdict, we consider all of the evidence in the record “ ‘in [a] light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.’” Sanford, 814 N.W.2d at 615 (quoting State v. Keopasaeuth, 645 N.W.2d 637, 640 (Iowa 2002)). We uphold the verdict if there is substantial evidence in the record supporting it. Id. “Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.” Id. We recognize that “ ‘the jury [is] free to reject certain evidence, and credit other evidence.’” Id. (quoting Nitcher, 720 N.W.2d at 556). Circumstantial evidence is equally as probative as direct evidence. State v. Meyers, 799 N.W.2d 132, 138 (Iowa 2011). “Evidence is not substantial if it raises only suspicion, speculation, or conjecture.” Yeo, 659 N.W.2d at 547-48.
*217 A. Summary of Testimony. E.N.’s rib fractures were first discovered by physicians when the hospital did a bone survey on July 9, the day after an unresponsive E.N. was rushed to the emergency room. Dr. Smith testified that E.N.’s bone survey revealed fifteen separate rib fractures, some on the same rib. Dr. Smith explained his process of dating rib fractures:
When a bone breaks, like a rib, it takes about seven days for the knitting of the bone by X-ray to begin [so] that you can actually see something called callus, which is the body’s healing attempt at the fracture.
If you have a rib fracture with no callus about it, then that rib fracture could have happened immediately, or it could have happened anywhere in the preceding seven days.
Dr. Smith was able to identify three fractures that were “fresh, in that zero-to-seven range.” The remaining fractures “were in the two- to four-week range.” He estimated that the oldest rib fractures were about four weeks old.
Dr. Smith testified that many of the rib fractures were on E.N.’s back, which he described as important because those are “very hard to get any other way than severe compression or squeezing.” He noted that “[i]t is possible to break them with a direct blow, but usually it is hard squeezing.” He also noted a number of lateral (side) rib fractures. With regard to these fractures, he explained as follows:
As you recall, a rib is a curved structure. I am holding my hand in a “C” shape, with the attachment to the spine here where my right hand is and the attachment to breast bone where my index finger is (indicating). So if you squeeze hard, you are going to put maximum stress right where my thumb joins my index finger. Those are called lateral rib fractures. That is where they snap.
Dr. Jenny gave similar testimony regarding the cause of E.N.’s rib fractures:
The multiple rib fractures are consistent with multiple episodes of having excessive pressure applied to the chest, squeezing the chest. It is actually hard to break baby ribs because they are very flexible.
If you punch a baby in the chest, they don’t break. But if you squeeze real hard — it is kind of like squeezing a beer can — they break at the sides and the back. When it squeezes shut, it pops at the sides and pops at the back. It takes excessive pressure to cause that degree of fractures. Those fractures are very painful.
During both time periods identified by the State under counts four and five — June 17 to June 30, 2009, and July 1 to July 8, 2009 — E.N. was alone with a number of different adult caregivers, including Jheri-ca, Jon, Mary, Shannon, and Connie. Jherica testified Jonas had no previous experience caring for babies and that he would become “impatient” when feeding E.N. because of issues with the bottle. When E.N. would cry, Jonas would pick him up and “kind of accelerate his voice,” telling E.N. “there is no need to cry,” or to “stop crying.” Jherica believed this scared E.N. When Jonas was unable to console E.N., he would get “frustrated” and “would just pass him off to the next person, whether that [was Jherica] or one of his parents.” Jherica testified that she never saw Jonas do anything that would have broken E.N.’s ribs.
B. Count Four Analysis— Older Rib Fractures. Jonas argues the State presented insufficient evidence to sustain his conviction under count four. The fourth count of the trial information charged Jonas with child endangerment for causing the older rib fractures. The *218 jury instruction required the State to prove:
1. On or about between approximately June 17, 2009 and June 30, 2009 the defendant:
a. knowingly acted in a manner that created a substantial risk to E.N.’s physical health or safety; or
b. by an intentional act or series of intentional acts, used unreasonable force: (i) that resulted in E.N. suffering a broken rib or ribs; or (ii) with the specific intent of causing serious injury to E.N.
2. When he committed the act(s), the defendant was E.N.’s parent.
3. As a result of the acts, E.N. suffered a serious injury.
Jonas argues the State failed to present “a scintilla of evidence ... that puts Jonas in proximity with E.N. from June 17th to June 30th from which it can be inferred that Jonas committed an act resulting in broken ribs.” Jonas relies on Hickman, in which we held “[t]he three separate acts required under [Iowa Code section 726.6A] should be established with enough precision to enable a jury to be satisfied beyond a reasonable doubt of a time and place where each of the three acts occurred.” 576 N.W.2d at 368. We subsequently clarified that
this rule does not mean that evidence of the precise time and place of each incident or act is required, but merely means the three or more acts must be separated by time and place so that each incident is separate and distinct.
Yeo, 659 N.W.2d at 550. We then noted as follows:
This approach is consistent with the language of the statute, as well as our general rule that the State is not required to prove the precise time and place of a crime. It is also compatible with the very nature of child abuse, and the inherent difficulty of establishing precise times and places of abuse to children due to the frequent delay in the discovery of the abuse, as well as other factors based on the nature of the crime.
Id. (citations omitted).
Under this standard, we held that the state had presented evidence sufficient to convict Yeo of each of the four separate counts of child endangerment. Id. at 551. At trial, the witness testimony had established Yeo was present each time the child was injured and had committed acts of abuse that were consistent with the child’s injuries. Id. at 549, 551; see also State v. Sayles, 662 N.W.2d 1, 3-7 (Iowa 2003) (holding evidence sufficient because circumstantial evidence established that child-victim was uninjured immediately before being left in the care of the defendant); State v. Watkins, 659 N.W.2d 526, 537 (Iowa 2003) (holding evidence sufficient when state proved the nonaccidental injuries were inflicted while the child-victim was in the exclusive care of the defendant).
The State’s evidence in this case, unlike that in Yeo, fails to meet the sufficiency threshold. A number of people aside from Jonas had been alone with E.N. during the time frame E.N.’s older rib fractures occurred, including Jherica; her mother, Connie; and sister, Shannon, as well as Jonas’s parents, Jon and Mary. The State presented no evidence establishing Jonas was alone with E.N. when the rib injuries occurred or that anyone saw Jonas squeeze E.N.
In its brief, the State appears to rely on a propensity argument in defending the sufficiency of the evidence under this count:
Neiderbach had no patience with [E.N.j’s crying and [E.N.] was crying, and Neiderbach was alone with him, just *219 before [E.N.] suffered the two injuries that can be specifically dated — the broken arm and the brain injury. Rational jurors could find that it was Neiderbach who squeezed [E.N.] and broke his ribs between approximately June 17 and June 80.
Normally, however, “evidence of one crime cannot be used to prove another crime occurred.” State v. White, 668 N.W.2d 850, 858 (Iowa 2003).
The evidence presented by the State at trial does little more than “raise[ ] ... suspicion, speculation, or conjecture” that Jonas broke the baby’s ribs. Yeo, 659 N.W.2d at 548. We conclude the evidence was insufficient to support his conviction under count four.
C. Count Five Analysis — Fresh Rib Fractures. Jonas argues the State presented insufficient evidence to sustain his conviction under count five. The fifth count charged Jonas with child endangerment for causing or aiding and abetting another who caused the new rib fractures. The jury instruction required the State to prove:
1.On or about between approximately July 1, 2009 and July 8, 2009 the defendant:
a. knowingly acted in a manner, or aided and abetted another in acting in a manner, that created a substantial risk to E.N.’s physical health or safety; or
b. by an intentional act or series of intentional acts, used unreasonable force: (i) that resulted in E.N. suffering a broken rib or ribs; or (ii) with the specific intent of causing a serious injury to E.N., or aided and abetted another in doing so.
2. When he committed, or aided and abetted, the act(s), the defendant was E.N.’s parent.
3. As a result of the acts, E.N. suffered a serious injury.
As with count four, Jonas’s challenge to his conviction on count five centers on the first element of the jury instruction. Jonas specifically argues the State presented insufficient evidence to establish when E.N.’s fresh rib injuries occurred so as to allow a reasonable jury to conclude beyond a reasonable doubt that Jonas committed an act causing those injuries or aided and abetted another to do so.[5] We agree.
Although this count differs from the previous count in that Jonas could be convicted if he either committed the act himself or aided and abetted the person who did, the evidence was insufficient under either theory. Several other people were alone with E.N. during this time period, including Jherica, Jon, Mary, Shannon, and Connie. The State did not present any evidence, direct or circumstantial, proving Jonas caused the fresh rib injuries or aided or abetted someone who did. Accordingly, we conclude the evidence is insufficient to support his conviction on count five.
*220 XIY. Conclusion.
We vacate the convictions on counts four and five because the evidence was insufficient to prove Jonas inflicted E.N.’s rib injuries. We reverse the order denying Jonas’s motion for an in camera review of Jherica’s mental health records. We remand the case to allow the district court to conduct that review pursuant to Iowa Code section 622.10(4)(a )(2) (Supp.2011) to determine whether her records contain exculpatory information. We affirm on all other issues. If no exculpatory evidence is found, Jonas’s convictions on counts one, two, three, and six are affirmed, and the district court shall resentence Jonas. If exculpatory evidence is found, then the district court shall proceed as set forth in section 622.10(4)faj(2)(c) and (d) to determine whether Jonas is entitled to a new trial.
AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.
All justices concur except CADY, C. J., who concurs specially, and APPEL, WIGGINS, and HECHT, JJ., who separately concur specially.

. For the sake of simplicity, we assume the state also meets the other requirements of ■ section 726.6A.

. Although it is true that the State was not required to prove Jonas committed all five of the individual counts of child endangerment to prove he committed multiple acts of child endangerment, we do not believe the analysis should differ simply because this case involved more than three charges of child endangerment under section 726.6. See Iowa Code § 726.6A (noting it applies when “[a] person ... engages in a course of conduct including three or more acts of child endangerment as defined in section 726.6 within a period of twelve months” (emphasis added)).

. This multistep procedure is similar to that prescribed in cases remanded for in camera reviews to determine whether exculpatory evidence was withheld in violation of the disclosure requirements in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). For example, in State v. Johnson, we concluded the district court erred by denying defendant’s motion to produce a list of names of those who witnessed the alleged crime and their statements. 272 N.W.2d 480, 485 (Iowa 1978). We remanded for an in camera review and directed that "[i]f it is found that exculpatory material was withheld from the defendant, then a new trial shall be granted. If not, the judgment shall stand affirmed.” Id. (citing prior Iowa cases using this procedure). The United States Supreme Court also has directed such a procedure in the Brady rule context. See Pennsylvania v. Ritchie, 480 U.S. 39, 58, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40, 58 (1987). The Ritchie Court held the defendant was entitled to have the trial court conduct an in camera review of the victim’s counseling records possessed by a state agency. Id. On remand, the defendant was to receive a new trial if the records ”contain[] information that probably would have changed the outcome of his trial.” Id. Conversely, if the records “contain no such information, or if the nondisclosure was harmless beyond a reasonable doubt, the lower court will be free to reinstate the prior conviction [previously vacated by the state appellate court].” Id.; see also State v. Garcia, 302 P.3d 111, 121 (N.M.Ct.App.2013) (citing Rit-chie in remand for trial court's in camera review of victim's mental health records, with new trial to be granted only upon determination that defendant had been prejudiced by improper exclusion of the records in first trial).

. Jonas’s motion also challenged the jury’s verdict as to count two, but he does not appeal the denial of his motion for new trial as to that count.

. Jonas also argues the State failed to prove the fresh rib fractures were caused by a mechanism other than the one that caused E.N.’s brain injuries. The State contends Jonas did not preserve this argument for appeal because "Neiderbach did not complain [at trial] that the acts causing the fresh fractures (Count 5) were not proven to be separate and distinct from those causing the brain injury (Count 2).” "To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal." State v. Truesdell, 679 N.W.2d 611, 615 (Iowa 2004). Because we hold the evidence was insufficient under Jonas's first argument, we decline to address whether Jonas preserved his second argument for appeal.