# IN THE COURT OF APPEALS OF IOWA

No. 22-0486
Filed October 11, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MARVIN OSWALDO ESCOBAR ORELLANA,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, David Porter, Judge.


        A defendant appeals his convictions for first-degree murder.  **AFFIRMED.**


        Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Thomas E. Bakke and Olivia D. Brooks, Assistant Attorneys General, for appellee.


        Heard by Greer, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

Rossibeth Flores-Rodriguez and her two young children died from close-range gunshot wounds to their heads in the home of Marvin Oswaldo Esquivel Lopez. After the shootings, Lopez called 911 to report he had "big trouble" at his house. He said that Rossibeth had killed her two children and, when she came up from the basement with a gun, he took it away from her and shot her. A jury did not find that story credible and found Lopez guilty on three counts of first-degree murder.[1]

Lopez appeals, claiming the district court abused its discretion in (1) overruling his objections to the prosecutor's argumentative questions when cross-examining him and (2) denying his motion for a new trial on the ground that the verdicts were contrary to the evidence. Finding no abuse of discretion, we affirm.

## I.    Background Facts and Proceedings

Hoping for a better life for her two children, eleven-year-old D.F. and five-year-old E.F., Rossibeth traveled from Honduras to the United States in early 2019. She used a coyote to help her cross the border into Texas,[2] where she was detained by immigration officials. Rossibeth contacted Lopez and his wife, Mariah, who agreed to let her live with them at their home in Iowa while she waited for her

---

[1] Although Lopez was charged by trial information under two names—Marvin Oswaldo Esquivel Lopez and Marvin Oswaldo Escobar Orellana—the parties agreed to refer to him by his former name at the jury trial. We will do the same on appeal.

[2] A coyote is slang for a person "who smuggles immigrants into the U.S." *Coyote*, Merriam-Webster, https://www.merriam-webster.com/dictionary/coyote.

detention hearing. Rossibeth knew Lopez from when he lived in Honduras and rented a house from her mother.

Rossibeth and her children moved into Lopez's home—a duplex with three bedrooms upstairs, a living room and kitchen on the main floor, and a basement. They settled into the basement, which was furnished with a couch, two beds, and a television. Lopez, Mariah, and their children lived upstairs. Lopez gave Rossibeth a job at his roofing company, and Mariah stayed at home with the children. Rossibeth needed to work because she had borrowed about $12,500 from friends and family to pay the coyote who helped her cross the border. According to her mother, Rossibeth had paid back about a quarter of the debt at the time of her death and her payments were on time.

Rossibeth's mother, who still lived in Honduras, talked to Rossibeth every day. She said that Rossibeth was "polite, loving, and respectful" and had a good relationship with her children. Lopez's wife, Mariah, said the same: "She was a very good mom." Rossibeth seemed happy when she first moved to Iowa, according to her mother. But as time went on, Rossibeth told her mother that she was afraid of Lopez. Rossibeth's mother testified that "she was going to leave and she had everything ready" to go. But on July 16, 2019—just a few days before she planned to move into an apartment with her boyfriend and children—Rossibeth and her children were shot to death.

According to Mariah, Lopez went to work that day around 6:00 a.m. Mariah stayed at home with her children until about 1:30 p.m., when she took them to the bank and store. Rossibeth and her children left at the same time. Mariah got back around 4:00 p.m. and stayed at home for the rest of the evening. Rossibeth came

home with her children at 6:00 p.m. She left again at 7:00 p.m., this time without her children. When Rossibeth was gone, Mariah could hear the children through the unfinished ceiling in the basement, laughing and watching television. The last time that Mariah saw Rossibeth's children was around 8:00 p.m., when Rossibeth came back to the house and the children went upstairs for a drink. The families then went to their separate levels of the home. Before putting her children to bed a bit before 10:00 p.m., when Lopez got home from work, Mariah could hear "normal TV noises and them talking" from the basement.

Once Lopez was home, Mariah went into the kitchen to get him something to eat while he went upstairs to change his clothes. About ten minutes later, Mariah said that Rossibeth came upstairs from the basement and started arguing with Lopez in the main-floor living room. Mariah didn't know what they were arguing about because it was in Spanish, and she only speaks English. But the argument escalated quickly, according to Mariah: "[S]he started yelling at him and he started to yell back." Then, Mariah said that Rossibeth shoved Lopez "and that's when he pulls his gun out and he shoots her."

These loud gunshots were the only shots Mariah heard that night. Shocked at what had just happened, Mariah's solitary thought was to "get out of there." So she gathered her children from their beds upstairs and fled to her grandmother's house about three hours away. Telling Mariah that he was sorry, Lopez stayed behind at the house. Once Mariah got to her grandmother's, she called the police. At first, Mariah told them that she hadn't seen anything. But she testified at trial, "That wasn't true. I saw everything." Mariah explained that she lied to the police because "I was freaked out. I didn't really believe what actually happened. I was

still shocked." Mariah was in such a panic that she forgot about Rossibeth's children in the basement.

Lopez called 911 just before 11:00 p.m., reporting, "I got a family who lives here in the house, and the mom [she] killed the two little kids." He said that she came up from the basement with a gun and "tried to fight and everything," so he took the gun away and "killed her too because [she] killed the two babies." Lopez stayed on the phone with the dispatcher until law enforcement arrived. The responding officers entered the home to find Rossibeth lying face-down on a rug in the living room. Lopez's gun—a .22 caliber Ruger Mark II semiautomatic pistol—two live rounds, and a Tupperware container full of more live rounds were on a table not far from Rossibeth. In the basement, an officer found D.F. and E.F. shot to death. E.F. was sitting slumped-down on his bed with his back against the wall, while D.F. was on the floor between the two beds—somewhat hidden by the taller bed's shadow—in a crouched position, with her knees up and arms covering her eyes. A detective investigating the shootings testified that it looked like she was "in a position of hiding." Lopez was arrested and charged with three counts of first-degree murder.

At trial, Lopez admitted that he shot Rossibeth. But he said that it was either an accident or in self-defense. In the weeks before the shootings, Lopez testified that Rossibeth had become very violent. She was supposedly angry with him because he refused to lend her $3000, although Lopez testified that he did loan Rossibeth's boyfriend $1200 for their new apartment. On the day that she died, Lopez said that Rossibeth texted him around 7:00 p.m. because she was upset with Mariah. When he called her back about an hour later, Lopez testified that she

was "very, very, very angry. Very, very angry." Mariah agreed that Rossibeth seemed mad that day, but not "crazy" like Lopez described.

Lopez testified that when he got home from work, Mariah and his children were gone. He thought they were out shopping at secondhand stores, which he said didn't close until 10:00 p.m. Lopez testified that he went into the living room, sat on the couch, and grabbed the remote to watch the television. Then, according to Lopez, Rossibeth came upstairs from the basement with his gun and a box of bullets in her hand. She put the bullets on the table in the living room, pointed the gun at Lopez, and

> began to scream. She was saying that she was going to kill me because I was an asshole that hadn't loaned her $3000 and that she wasn't going to give the father of her kids the satisfaction and that she had already killed her children. That's when she came towards me.

Lopez testified that he hit the gun out of Rossibeth's hand, picked it up from the floor, and tried to calm her down. But she kept "yelling and yelling." That's when Lopez said that "she came on top of me and started hitting me and I was backing up." As he backed up, Lopez testified that he tried to "take the magazine out [of the gun], but the lock was really hard." So he "started to take the bullets out of the top." He was only able to get two bullets out before Rossibeth grabbed the barrel of the gun and started to hit him.[3] Lopez testified, "[A]nd that is when the gun went off with two shots."

---

[3] But in an interview with a detective after the murders, Lopez testified that when Rossibeth came upstairs from the basement, she had the gun and two bullets in her hand and said she was going to kill him.

Rossibeth's autopsy showed that she had "a graze gunshot wound to the right frontal scalp" and another wound to the base of her right thumb. The medical examiner thought the thumb wound was a defensive injury incurred "while attempting to shield one's self," likely from the first bullet that grazed her head. Rossibeth also had a second gunshot wound to her right posterior temple, which the examiner said would have almost immediately made her collapse. That wound had a "curved orange to red abrasion." The medical examiner testified that most likely represented "a muzzle imprint indicating the gun was most likely in contact with the target when the trigger was pulled." In other words, the muzzle of the gun was pressed to Rossibeth's head when it was fired. The children's autopsies showed that, like their mother, they had each been shot twice in the head at close range.

On cross-examination, the prosecutor pushed Lopez to clarify whether he shot Rossibeth twice by accident or in self-defense. He claimed it was an accident: "It was one after the other. The things went very fast." "When she hit my hand, that's when I grabbed it, and that's when the two shots went off." The prosecutor challenged Lopez on how two bullets managed to go off, considering that a detective had testified that Lopez's gun required the user to pull the trigger every time a bullet is fired: "One bullet [is] ejected for each squeeze of the trigger." This part of Lopez's cross-examination became contentious, with Lopez insisting, "I didn't squeeze it twice. I just felt that my finger moved twice." As the prosecutor continued to press Lopez on this point, his attorney repeatedly objected to the questioning as argumentative. The district court overruled some of the objections and directed the prosecutor to rephrase the questions in response to others. In

the end, all Lopez would say was that the two bullets struck Rossibeth "accidentally, because I didn't want to shoot them."

In closing, the State argued that Rossibeth's death was "not an accident. That's an execution. That is cold-blooded murder." As for Lopez's theory that Rossibeth shot her own children, the State argued that was inconsistent with Mariah's testimony that before she left the house, the only gunshots she heard were the ones that killed Rossibeth:

> [S]he heard gunshots exactly once, and it was when the defendant was shooting Rosie.[4] She didn't hear gunshots before that. She didn't hear gunshots after that.
> . . . . That means that [the gunshots] happened sometime between the time that Mariah leaves and the police arrive. And who was in that house during that time, in that house and alive? Only the defendant. Only the defendant was there when [E.F.] and [D.F.] were there. That is proof beyond a reasonable doubt that he was the shooter.

The defense challenged this theory in its closing, pointing out that Mariah told a different story when she first called the police and highlighting her inability to remember details about the shooting—"With a complete inability to tell us any details or have any consistency on what actually happened, was she even really there? It's more likely maybe she wasn't." As for why a mother would shoot her own children, Lopez's defense theorized that "fear made her crazy," fear of "being separated or deported, something really bad and awful happening to them" because of the money she owed back home.

The jury rejected that theory, finding Lopez guilty as charged on all three counts of first-degree murder. Lopez moved for a new trial, arguing the verdicts

---

[4] Rossibeth also went by Rosie.

were contrary to the weight of the evidence. The district court denied that motion at sentencing, and Lopez appeals.

## II. Analysis

### A. Evidentiary Rulings

Lopez claims the district court abused its discretion "in failing to sustain objections to the prosecutor's repeated argumentative questions during cross-examination." The questions highlighted by Lopez on appeal as improper are:

> Q. Well, in fact, you did pull that trigger twice when you were pointing it at Rossibeth, did you not?
> [DEFENSE COUNSEL]: Objection. Argumentative.
> THE COURT: Overruled.
> . . . .
> Mr. Lopez, the question was: Well, in fact, you did pull the trigger twice when you were pointing at Rossibeth, did you not?
> THE WITNESS: I didn't squeeze it twice. I just felt that my finger moved twice.
> . . . .
> Q. Mr. [Lopez], you put the muzzle of that gun to Rosie's head and pulled the trigger. That wasn't an accident, was it?
> [DEFENSE COUNSEL]: Objection. Argumentative.
> THE COURT: Overruled.
> . . . .
> Q. Mr. Lopez, when you put the muzzle of the gun to the side of Rossibeth's head and squeezed the trigger, that was not an accident, was it?
> [DEFENSE COUNSEL]: Your Honor, I renew the objection again.
> . . . .
> THE COURT: So, [counsel], just rephrase that question, please.
> Q. Mr. [Lopez], when you placed the muzzle of that gun to the side of Rosie's head and pulled the trigger, that was not an accident, was it?
> [DEFENSE COUNSEL]: Objection. Argumentative.
> THE COURT: [Counsel], rephrase the question.

Starting from the premise that "a prosecutor is not an advocate in the normal meaning of the word" because of the prosecutor's "duty to the defendant to ensure

a fair trial," Lopez claims this questioning was improper. He argues that it violated the prosecutor's "'duty to keep the record free of undue denunciations or inflammatory utterances' and would 'appeal to the passion and prejudice of the jury.'" (Citation omitted.) Yet in district court, Lopez only objected to the prosecutor's questions as argumentative; he did not move for a mistrial or raise the prosecutorial-misconduct claim that he now seems to be making on appeal. We accordingly agree with the State that error was not preserved on any such claim. *See State v. Krogmann*, 804 N.W.2d 518, 526 (Iowa 2011) (holding that because the defendant only objected to a question as argumentative and "asked for no further relief such as a mistrial," he "cannot obtain a new trial based on prosecutorial misconduct" on appeal).

As for whether the court abused its discretion in overruling the objections, we start from the well-settled premise "that the manner in which, and the extent to which, cross-examination of a defendant may be pursued is largely a matter of the trial court's discretion, and its ruling will be disturbed only upon a clear showing that such discretion has been abused." *State v. Broten*, 176 N.W.2d 827, 828 (Iowa 1970). The discretion afforded to the court in making these calls recognizes that "the relationship between counsel and the witness, the volume, tone of voice, inflection, emphasis and gestures all affect the thrust of the question." 5 Handbook of Fed. Evid. § 611:20 (9th ed.) (Nov. 2022 update). Thus, "what appears argumentative to some courts is perfectly proper cross-examination in others." *Id.* We find no abuse of the court's discretion here.

In the State's case-in-chief, the medical examiner testified that Rossibeth suffered two gunshot wounds to the head. So when Lopez testified in his defense,

he claimed "the two bullets went off" when Rossibeth tried to "grab the gun with her hand" and "attack [him] with the other." He continued: "[I]t was very fast. She was right in front of me like this. She grabbed it like this and she—it went boom like this. She moved her head to the side and then the other bullet went off . . . ." The prosecutor tried to clarify this story on cross-examination, asking Lopez, "did you shoot Rossibeth by accident or in self-defense?" Lopez answered, "I don't know exactly how to explain it because she attacked me," though he agreed that once he took the gun away from her, she was unarmed. In response, the prosecutor pressed Lopez on whether two bullets could "come out of that gun with one trigger squeeze" and whether it was possible for both to have accidentally struck Rossibeth, leading to the challenged exchange.

By offering himself as a witness, Lopez subjected "himself to the same rules on impeachment and credibility as other witnesses." *State v. Harrington*, 178 N.W.2d 314, 316 (Iowa 1970). And cross-examination "should always be allowed relative to the details of an event or transaction." *State v. Damme*, 522 N.W.2d 321, 325 (Iowa Ct. App. 1994). The context of the omitted questions shows the prosecutor was properly seeking answers about the mechanics of what Lopez claimed happened to Rossibeth. *Cf. People v. Chapman*, 133 P.3d 534, 563 (Cal. 2006) ("An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable."); *accord State v. Thornburgh*, 220 N.W.2d 579, 585 (Iowa 1974) ("An argumentative question is one that 'merely invokes the witness'[s] assent to the questioner's inferences from or

interpretations of the facts proved or assumed.'" (citation omitted)). We accordingly reject this assignment of error.

### B.    Motion for New Trial

Lopez next claims the court abused its discretion in denying his motion for a new trial as contrary to the weight of the evidence. We review this claim for an abuse of discretion. *See State v. Stendrup*, 983 N.W.2d 231, 246 (Iowa 2022). "Our review is not to determine whether the verdict is contrary to the weight of the evidence but only to determine whether the district court abused its considerable discretion in denying the motion." *Id.* "A district court should grant a motion for a new trial only in exceptional circumstances." *Id.* (citation omitted). Those circumstances are not present here.

For the first-degree murder count involving Rossibeth, Lopez claims "the greater weight of the evidence presented supports [his] version of events that the shooting occurred as an accident following a struggle with Rosie." He focuses on Mariah's concession that she initially lied to the police, and her inability to remember some details about the shooting, in arguing that his testimony "was far more credible." But "it is not our role to judge the credibility of witnesses on our appellate review" of whether a verdict was contrary to the weight of the evidence. *State v. Neiderbach*, 837 N.W.2d 180, 216 (Iowa 2013). Instead, "our task is simply to determine whether the district court manifestly abused its discretion." *Stendrup*, 983 N.W.2d at 246. It did not, considering the direct and circumstantial evidence weighed by the district court, including the autopsy findings that Rossibeth was shot twice in the head, with the "second shot fired at 'point blank' range into her head," as the State points out in its appellate brief.

As for the two counts involving the children, Lopez argues "the State failed to produce any evidence placing Lopez anywhere close to the basement." He contends,

> [a]t all times relevant to the shooting of the children, Lopez was either outside of the house or on the first floor. Mariah never testified that she saw Lopez go to the basement. Lopez testified that he did not go into the basement. And, the investigators found no forensic evidence to show that Lopez was in the basement at the time of their deaths.

The district court rejected this argument, agreeing with the State that the greater weight of the evidence showed "that the children were still alive in the basement when Mariah . . . left the home following Rossibeth's shooting, and they, the children, were killed sometime before the police arrived or . . . shortly thereafter." Because Lopez "was the only living person in the home in that time frame," the court found the greater weight of the "evidence clearly established that the defendant, after shooting Rossibeth, went into the basement and shot the two children." Most compelling, according to the court, was "the similarity in the injuries to each of the three victims with two gunshot wounds to the head." We again find no manifest abuse of discretion in the court's denial of Lopez's motion for new trial on these counts. *See id.*

## III.  Conclusion

We affirm Lopez's three convictions for first-degree murder, finding no abuse of discretion in the district court's rulings on Lopez's objections to questions as argumentative or in its denial of his motion for a new trial on weight-of-the-evidence grounds.

**AFFIRMED.**