# IN THE COURT OF APPEALS OF IOWA

No. 24-0336
Filed August 6, 2025

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**AARON C. JOHNSON,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Monica Ackley, Judge.

Aaron Johnson appeals his convictions for first-degree murder and first-degree robbery. **AFFIRMED.**

Christopher A. Kragnes of Kragnes & Associates, PC, Des Moines, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Considered without oral argument by Ahlers, P.J., Buller, J., and Telleen, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**TELLEEN, Senior Judge.**

Aaron Johnson appeals his convictions for first-degree murder and first-degree robbery.  He argues the prosecutor engaged in misconduct and the district court erred in not providing his requested instruction on extortion.  We affirm.

## I.     Background Facts and Proceedings

In February 2023, Jermaine Bolds was living with Tiarha Godwin and her family in Dubuque.  Laniga Hannon was also staying there in February but "would kind of go between [Godwin's] house and her mom's house."  Bolds was unemployed and sold marijuana.  One day, Bolds, Hannon, and Godwin were discussing the prospect of committing a theft—a "lick."  Hannon suggested that an acquaintance of Godwin's named Lonnie Burns would be a good target "to get a lick on."  Hannon claimed he was a felon, so he would not have guns in his house.  She believed Burns had a large quantity of marijuana and kept shoeboxes of cash in his home.

While making the plans, Bolds claimed he had friends who could assist with execution of the plot.  Bolds reached out to Kenneth Reed on Facebook and asked if he would come to Dubuque.  Reed agreed to come to Dubuque.  Bolds and Hanon drove to Chicago to pick up Johnson and Bolds told Johnson "he had a lick."  The group then drove to Indianapolis to pick up Reed.  Once Reed was in the car, Bolds also told Reed about the planned lick.  Reed brought a gun on the trip.

The group arrived in Dubuque on February 6.  They spent most of the day in the living room.  Bolds called Terry Valrie and had him come to the house to cut his hair.  Valrie heard about the plan to "lick" Burns and wanted to join.  About "half

a pound" of weed and Reed's gun were on the living room table. Bolds was looking at the gun because he wanted to purchase it from Reed as protection during marijuana distributions.

Bolds had Godwin—who was sixteen years old at this time—text Burns to make plans for her "to go to [Burns's] house to exchange sexual favors for drugs and money." Bolds believed Burns "like[d] young girls, . . . younger than eighteen" and called him a "pedophile." Bolds also texted Burns while posing as Godwin on Snapchat. The plan was to have Godwin show up for the meeting with Burns, who would believe her to be by herself. The group planned to burst through Burns's front door immediately after Burns opened the front door for Godwin. They would then threaten to call the police on Burns "for having sex with an underage girl" if he did not give them his marijuana and cash.

Godwin eventually arranged the meeting with Burns. The group consisting of Johnson, Bolds, Hannon, Godwin, Reed, and Valrie drove to Burns's house. Reed testified that Valrie brought a gun with him and that Bolds had Reed's gun before the group left for Burns's home. Burns drove down back streets and the entire group besides Godwin wore ski masks in an effort to avoid camera detection. Valrie testified that Johnson was in possession of Reed's gun while the group was in the car.

Parking about a block away from Burns's home, Godwin approached the home ahead of the rest of the group. When Burns let Godwin into the house, the group did not burst in behind her as she expected. After Godwin had been inside for several minutes, the group knocked on the front door. Burns did not open the

door and twice told the group to "get off his porch." While Burns was at the front door, Godwin left out a side door and returned to the group.

The group discussed what to do next and considered leaving when Valrie "said he was going to call the police," causing Burns to peer outside of the front door. Burns said he would give the group what they wanted, went back in the house, and came back out with a bag. He and the group had a verbal exchange, with Bolds "telling him, like, she's a minor, and you shouldn't be messing with her. She's underage. If you don't give us what you got, I'm going to call the police." Burns then told the group he was not going to give them anything and began "backing up towards the house." Johnson told Burns "he's not going to be the one to go back and forth with [Burns]." Johnson proceeded to "c[o]me around, and then he raised the gun to [Burns]," and Burns "jumped at Johnson, . . . and then some shots were fired."

Immediately following the first shot, the members of the group ran in separate directions with Burns running back towards the porch. Another shot was fired and Johnson fired one last shot at Burns as Burns retreated towards his home and then ran off. When police officers reported to the scene, Burns was unresponsive, laying "face down" in the snow, and had blood on his back. The responding officers conducted CPR until paramedics arrived several minutes later. Paramedics transported Burns to the hospital where an emergency room doctor declared him dead following "continued lifesaving efforts." A medical autopsy showed that Burns was shot once in the "left armpit region," once between the left armpit and chest, and once in the "lower left back."

Following the shooting, Johnson told Reed he "didn't mean to do it" and "that they needed to leave town." Johnson was then arrested on February 23, by U.S. Marshals in Chicago. Johnson was charged by trial information in Iowa District Court with first-degree murder, first-degree robbery, and felon in possession of a firearm. The murder and robbery charges were tried before a jury from November 28 to December 5, 2023.

The jury returned a verdict finding Johnson guilty as charged. Johnson filed a motion for new trial and in arrest of judgment, which the district court denied. Johnson then moved to enlarge the district court's order on Johnson's new trial motion. The district court entered an order clarifying its prior order and further denying Johnson's new trial motion.

Johnson now appeals

## II.     Standard of Review

"A district court should grant a motion for a new trial only in exceptional circumstances." *State v. Ary*, 877 N.W.2d 686, 705 (Iowa 2016). When a district court denies a motion for new trial based on prosecutorial misconduct, we review for an abuse of discretion. *State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015).

We review challenges to jury instructions for correction of legal error. *State v. Anderson*, 636 N.W.2d 26, 30 (Iowa 2001). But when that challenge invokes a constitutional violation, we review de novo. *Taylor v. State*, 352 N.W.2d 683, 684 (Iowa 1984).

**III.     Discussion**

*A. Error Preservation*

As an initial matter, we address error preservation as it relates to several of Johnson's allegations of prosecutor misconduct during closing arguments. Johnson argues "the prosecutor acted improperly by repeatedly making inflammatory and prejudicial statements disparaging the defense."

Johnson argues it was misconduct for the prosecutor to accuse defense counsel of "gaslighting." The prosecutor stated that "There's also a term out there, it's called gaslighting. That's what you just heard from [defense counsel]. It's gaslighting. He threw all of this smoke out there, but it's not supported by one shred of evidence. It's a nice story." Defense counsel objected to the statement but did not move for a mistrial at the time of the comments.

He also argues "the State went too far and encouraged the jury to decide the case on something other than the evidence presented." During closing arguments the prosecutor stated that, "This sort of brutality cannot be allowed in our community," in reference to Johnson's actions. Defense counsel did not object to this statement or move for a mistrial at the time of the comments.

Johnson additionally takes issue with what he argues were claims by the State that he "had attempted to elicit the media and abandoned his self-defense claim." He points to the prosecutor's claim that Johnson "called from jail to his sister regarding the newspaper" on March 5—Johnson argues that call occurred on March 4. He also argues the State improperly attributed to Johnson certain statements made by Bolds. Defense counsel did not object to any of those statements or move for a mistrial at the time of the comments.

Johnson argues he preserved error by filing timely motions in arrest of judgment and for new trial and to enlarge. The State contests error preservation on these statements, arguing "any claim of prosecutorial misconduct during closing arguments is unpreserved because [Johnson] did not move for a mistrial at the time the comments were made."

A defendant "cannot obtain a new trial asserting prosecutorial misconduct when he failed to move for a mistrial at the time the alleged prosecutorial misconduct occurred." *State v. Farnsworth*, No. 13-0401, 2014 WL 2884732, at *3 (Iowa Ct. App. June 25, 2014); *State v. Krogmann*, 804 N.W.2d 518, 526 (Iowa 2011) ("[The defendant] cannot obtain a new trial based on prosecutorial misconduct when he failed to move for a mistrial at the time."); *State v. Radeke*, 444 N.W.2d 476, 479 (Iowa 1989) ("In permitting the case to be submitted to the jury without asserting the denial of a fair trial by reason of the alleged misconduct, defendant's counsel indicates a willingness to take a chance on a favorable verdict and waives the claim of misconduct.").

But where an objection to alleged prosecutorial misconduct is overruled, no motion for new trial is required at the time of the objection. *State v. Neiderbach*, 837 N.W.2d 180, 209 (Iowa 2013). When the objection was sustained, "the district court had no reason to believe that the defendant wanted anything further done with respect to the prosecutor's improper question. That rationale does not apply when the defendant's objection is overruled. . . . That duty is satisfied by the objection." *Id.* (cleaned up).

Accordingly, Johnson has failed to preserve error on any prosecutorial statement to which he did not object. The district court did not directly sustain his

objection on the gaslighting statement, only reminding the jury to "[r]emember your instructions." But because we can dispose of Johnson's claim regarding that statement on the merits, we assume without deciding that he has met his error preservation duty on that objection.

### B. Prosecutorial Misconduct

Johnson has two preserved prosecutorial misconduct claims: the "gaslighting" comment, as well as what Johnson refers to as an "allegation of dishonesty directed towards defense counsel."

A successful claim of prosecutorial misconduct requires the "defendant [to] show both (1) error or misconduct and (2) prejudice." *State v. Plain*, 898 N.W.2d 801, 818 (Iowa 2017). Unlike an "ordinary advocate," a prosecutor owes a duty to the defendant in addition to their duty to the public. *Id*. Their duty to the defendant is to ensure that due process requirements are complied with throughout the trial process. *State v. Graves,* 668 N.W.2d 860, 870 (Iowa 2003). "[W]hile a prosecutor is properly an advocate for the State within the bounds of the law, the prosecutor's primary interest should be to see that justice is done, not to obtain a conviction." *Id.* A defendant is prejudiced by a prosecutor's misconduct when their right "to have his or her guilt or innocence determined solely on the basis of the evidence introduced at trial" is "threatened by any incident likely to prejudice the jury." *Id.* at 876–77 (cleaned up). We must ask if the misconduct raised a "reasonable probability" of inflaming or misleading the jurors. *Id.*

We see no abuse of discretion in the district court's denial of new trial over alleged prosecutorial misconduct. The prosecutor's comment that the defense was "gaslighting" was not misconduct. While that comment, in isolation, could

suggest that defense counsel was purposefully misleading the jury, the prosecutor went on to explain in the very next sentence that defense counsel "threw all of this smoke out there, but it's not supported by one shred of evidence. It's a nice story. It's got no support whatsoever." The prosecutor further explained the various ways in which he believed defense counsel's arguments were contrary to the evidence, including that "the Snapchat [sent to Burns] that was up on the screen could be used for extortion. Well, you know what? It could be used for robbery as well, and it was." He implored the jury to "have [a] look at the rest of the evidence. You have to look at that video and see what happened for yourselves." We cannot conclude that the gaslighting statement was prosecutorial misconduct.

At trial, an investigator testified relating to comments made by Johnson during jail phone calls. It appears that there was confusion between the prosecutor, defense counsel, and the district court as to whether portions of the phone calls or the full phone calls had been admitted into evidence. That confusion led to the following interaction at trial:

> Defense counsel: [Johnson] says at one point on one of those phone calls, I believe it's specifically the one that was on March 5th at 11:28 a.m., about nine minutes into that phone call, [Johnson] says words to the effect of, That shit was an accident, close quote. Does that sound right?
> Prosecutor: Is it relevant?
> Defense counsel: It is relevant, because the State put that in.
> Prosecutor: I object, Your Honor. He's asking about something that's not in evidence.
> Defense counsel: Well, hang on. Did the State cherry-pick Exhibit 37 and which portions of those phone calls they put in?
> District Court: That I don't know.
> Defense counsel: I thought they were all in.
> Prosecutor: I object to the term cherry-pick.
> District Court: Okay. Hold on. The investigator indicated he listened to all of what was recorded at the jail, so that means he has knowledge of the contents of the conversations. [Defense counsel]

is correct that what the jury heard were portions of those calls. I don't know if you gentleman want the entire phone calls being played so the jury hears the remaining portions or not?

Prosecutor: They can put them in evidence if they want.

Defense counsel: I'm actually not allowed to put them in— well, I guess now I can, since they put them into evidence, but I thought Exhibit 37 was the entire phone calls.

District Court: I don't know whether it was or it was not?

Prosecutor: They were all provided.

Defense counsel: It wasn't all provided. What we got was a piece of paper that showed times that phone calls were made.

Prosecutor: That's not true. Everything was –

Defense counsel: That's not true?

District Court: All right. Hold on. I'll have [the jury] leave the room. I'll settle this legally.

[JURY DISMISSED]

District Court: All right. Sit down. Very clearly and succinctly, we'll make a record of what it is we're discussing.

Defense counsel: Your honor, first off, I'm going to ask that the jury be instructed to disregard the comment that was just said in front of them. That is not true. I am personally offended that the county attorney just called me a liar in front of the jury. That is completely inappropriate and unprofessional. And my tone, Your Honor, is not directed at the Court. It's at the county attorney.

District Court: I understand.

Prosecutor: I object to that characterization. It's not correct. I said it was not true.

So what we gather from this exchange is that that defense counsel believed the entirety of each phone call had been submitted into evidence by the State. The State, believing it had only submitted relevant excerpts of the calls, was attempting to correct the record by clarifying "that's not true" to defense counsel's assertion that the entirety of each phone calls was in evidence. There is no reasonable interpretation of this exchange where the prosecutor can be seen as asserting that defense counsel was a "liar." We view the comments as the prosecutor's attempt to create clarity.

We thus conclude that the prosecutor did not engage in any prosecutorial misconduct.

### C. Jury Instruction on Extortion

Johnson next contends he was "denied the opportunity to properly present his theory of defense because the trial court erred in failing to give [his] requested instruction on extortion[,] thereby denying him his constitutional right to present a complete defense."

Typically, a district court is required to give the instructions requested by the parties if they correctly state the law, materially apply to the case, and are not otherwise embodied in other instructions. *State v. Kellogg*, 542 N.W.2d 514, 516 (Iowa 1996). But "[a] jury instruction can be erroneous if it's 'misleading and confusing,' even if it's 'derived from an accurate statement of the law.'" *State v. Johnson,* 7 N.W.3d 504, 509–10 (Iowa 2024) (citation omitted). "A proper theory of defense instruction is one which sets forth a set of facts which would preclude a finding of guilt." *State v. Roberts*, No. 00-1989, 2002 WL 531522, at *2 (Iowa Ct. App. Mar. 27, 2002).

At trial, Johnson argued that he committed extortion rather than robbery. Consequently, he proposed a jury instruction for extortion. The problem with this argument is that the defense's theory that Johnson committed extortion in no way precludes a finding that he also committed robbery. The jury being instructed on this theory of defense would make sense if an extortion finding made it impossible to convict Johnson of robbery. *Cf. id.* ("Even if the jury found Roberts' actions did constitute [the uncharged crime of] exercising control over stolen property, there still exists in the record sufficient evidence from which the jury might conclude he committed the [charged] offenses.") Indeed, it is fully possible that Johnson threatened over Snapchat to call the police on Burns if Burns did not "give up [his]

stuff" while also showing up to Burns's house with a mask and gun to take his "stuff" by force. Because these crimes are not mutually exclusive, instructing the jury on the uncharged crime would have had a tendency to mislead or confuse them. Our existing caselaw does not allow for the issuance of a theory of defense instruction for an uncharged crime when that uncharged crime would not preclude a finding of guilt on the charged crimes. *See State v. Kase*, 344 N.W.2d 223, 226 (Iowa 1984).

And the district court's refusal to include the instruction did not prevent Johnson from presenting the theory as a defense. Indeed, the district court explained that "the defense has the opportunity to argue that robbery was not committed and the offense looks more [like] an extortion." The jury heard extensive testimony from the members of Johnson's group about their plan to threaten to call the police on Burns. The court's refusal to instruct the jury on uncharged crimes in no way prevents the defense from presenting alternative crimes as a theory of defense. We agree with the district court that this instruction should not have been given.

Accordingly, finding no prosecutorial misconduct and agreeing that the extortion instruction should not have been given, we affirm the district court in all respects.

**AFFIRMED.**