# IN THE COURT OF APPEALS OF IOWA

No. 24-0598
Filed December 3, 2025

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**REBECCA MARIE LYONS,**
     Defendant-Appellant.
_____

     Appeal from the Iowa District Court for Polk County, David Nelmark, Judge.


     A defendant appeals her convictions for three counts of attempted murder and two counts of assault with intent to inflict serious injury.   **AFFIRMED.**



     Jessica A. Millage of Flanagan Law Group, PLLC, Des Moines, for appellant.

     Brenna Bird, Attorney General, and Katherine Wenman, Assistant Attorney General, for appellee.


     Considered without oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**TABOR, Chief Judge.**

Rebecca Lyons—along with her father, Robert Lyons, and her daughter's boyfriend, John Alcorn—procured guns and fired numerous rounds from inside a Des Moines house toward a trio of visitors from Davenport.[1]  After hearing testimony from the shooting victims and the shooters, among other witnesses, a jury convicted Rebecca Lyons of three counts of attempted murder and two counts of assault with intent to inflict serious injury.  On appeal, she argues the verdicts were contrary to the greater weight of the evidence and the district court should not have instructed the jury on the theory of aiding and abetting.

Neither argument prevails.  She didn't preserve error on her weight-of-the-evidence claim, and because the State presented substantial evidence that she aided and abetted her father and Alcorn in the shooting, the jury instructions were proper.  Thus, we affirm.

## I.    Facts and Prior Proceedings

In 2022, Rebecca and her three teenaged children lived with her father and mother, Robert and Vicki Lyons, in Des Moines.  In March, her daughter Keke's boyfriend, Alcorn, arrived at their house with property that he had taken from his roommate, Jerrel, in Davenport.  The dispute over that property sparked the violent event underling this appeal.

Alcorn moved into Jerrel's apartment just before Thanksgiving 2021.  Jerrel was working full-time for a local company, but he also had a "side hustle" selling

---

[1] In this opinion, we refer to the victims by their first names: Jerrel, Jeramie, and Stephanie.  And for clarity's sake, we will use first names for Rebecca and Robert when we refer to them individually.

marijuana and ecstasy. After Alcorn moved in, Jerrel recruited him to sell drugs, which allowed Alcorn to cover his delinquent rent payments. But their arrangement did not work out as Jerrel expected.

In March 2022, Jerrel confronted Alcorn, accusing him of owing a drug debt of $400. According to Jerrel, Alcorn agreed to buy "a pound of weed" for Jerrel to sell. But when Jerrel came home from work on March 11, he found the apartment unlocked and he was missing cash, a pair of Jordan sneakers, and other belongings. He suspected Alcorn had taken the property. When Jerrel tried to reach his roommate, Alcorn ignored his calls.

Two days later, Jerrel confirmed his suspicion by text messaging with Keke, who was with Alcorn in Des Moines. After leaving Davenport, Alcorn stayed at the Lyons' house. And that's where Alcorn stashed what he took from Jerrel, according to Keke. In a video call, Jerrel offered to pay Keke to retrieve his property. During that call, Alcorn took Keke's phone. By his own testimony, Alcorn was "furious" when he discovered Keke was talking to Jerrel. His fury led to a series of text threats from Keke's phone, including: "N----- u dead I got fire u dead." In another text from Keke's phone, Jerrel received an address for the Lyons' house.

After this exchange, Jerrel decided to travel to Des Moines to recover his belongings. He found a ride with his friend Jeramie and Jeramie's girlfriend, Stephanie. Stephanie was happy to drive; she just bought a Ford Escape and was a "huge fan of road trips." The trio left Davenport around 5:30 p.m. and arrived in

Des Moines just before 9:00 p.m.  Stephanie parked across the street from the address that Jerrel had for the Lyons' house.

Jerrel walked to the front door by himself.  He rang the doorbell, which was equipped with a video camera that captured the events.  That video showed Jerrel waiting patiently for someone to answer.  When Robert came to the door, Jerrel explained in measured tones that he was there to talk to Keke or Alcorn.  Jerell told Robert that Alcorn "took his stuff" and that "if my stuff is here I would like to get my stuff back."  Soon Rebecca stepped outside and said she was "armed to carry." She also said that Alcorn left, which wasn't true.[2]  She said that this was her parents' house and "shit can't be popping off over here."  Jerrel assured her that he and his friends were unarmed.[3]  Rebecca gave Jerrel her phone number, and she agreed to check on his belongings.  During that exchange between Jerrel and Rebecca, Robert reappeared at the door carrying an M4Carbine rifle.  Following suit, Rebecca pulled a pistol from her sweatshirt.  In reaction, Jerrel hopped down from the stoop, hands in the air, reminding them that he was "not armed."  Robert responded: "Well, we are all armed."  Rebecca added: "We got M4s, we got AKs, we got everything.  And we're ready to shoot up whoever comes over here."

After hearing news of their arsenal, Jerrel walked toward the Ford Escape, before noticing that he did not have Rebecca's number saved in his phone.  He rang the doorbell again, stepped off the stoop, and waited.  But rather than answering the door, Rebecca yelled out the window that the police were on their

---

[2] Rebecca testified that Alcorn told her that Keke had cheated on him and that "people were coming from Chicago to kill him."
[3] Jerrel didn't know that Stephanie had an unloaded firearm in her purse.  She had a license to carry and did not remove the gun during these events.

way. Jerrel replied "that's fine" but repeated several times that he "got scared and lost [her] number." Then, as Jerrel stood in the middle of the lawn, shots rang out.

At trial, Alcorn took responsibility for the opening salvo. But he told the jury that they were warning shots:

> So I don't know what was being said at the door, what was being said in the yard. I just know I kept on hearing Rebecca saying, "You need to leave, we're calling the police." Then I seen a revolver on the counter and I asked the grandmother, "Is this like Florida, stand your ground?" She confirmed it and said yes, and that's when I took the revolver and I shot two times.[4] I wasn't aiming at Jerrel, I aimed directly behind him.

Meanwhile, just before the shooting started, the grandmother, Vicki Lyons, called 911 to ask for help: "We've got some guys from Chicago down here, we were told they're coming down here to shoot my house up." She told the dispatcher that they had rung the doorbell twice. She warned: "We're armed to the hilt, so if we want to have a gun fight. I'm telling you right now, this is what we're going to do." While she's still on the line, shots ring out and she told the dispatcher: "they're sitting outside my house, they're all fucking shooting man."

By the time Alcorn started shooting, Robert had slipped out the back door and "stationed" himself at the corner of the house to "get to a better vantage point." From that vantage point, Robert emptied the thirty-round magazine of the M4 Carbine automatic rifle, before going back inside the house and firing another five rounds from a .45 caliber pistol. The last shooter was Rebecca. She discharged seven rounds from the same window with a nine-millimeter pistol.

---

[4] The record does not support Alcorn's claim to firing only twice. Rather, the State's evidence suggested that he discharged all six rounds from a .356 revolver—out the same window where Rebecca had been calling to Jerrel.

The bombardment of bullets took a toll on Stephanie and Jeramie. Stephanie suffered gunshot wounds to her left shoulder, left hip, and neck. Her Ford Escape was riddled with bullet holes. Jeramie was shot in the chest and struggled to breath. At trial, the defendants stipulated that the shooting caused Jeramie and Stephanie serious injuries. Jerrel was uninjured.

When police responded to the chaotic scene, they secured six individuals who had been inside the Lyons' home, including Rebecca. Crime scene investigators seized eleven firearms from inside the house and collected dozens of shell casings from the guns that were fired. At the scene, Rebecca told an officer that Jerrel "started opening fire" from Stephanie's vehicle. Alcorn and Robert also claimed in their police interviews that Jerrel and his companions fired first from across the street.

The State charged Rebecca and Robert Lyons, as well as Alcorn, with three counts of attempted murder and two counts of willful injury causing serious injury. They were tried together. The jury found Rebecca guilty of three counts of attempted murder and two counts of assault with intent to inflict serious injury— lesser included offenses of willful injury.[5] The district court sentenced her to a prison term not to exceed twenty-five years with a mandatory minimum sentence of seventeen and one-half years. She now appeals.

---

[5] The jury found Alcorn and Robert Lyons guilty as charged. We also decide their appeals today. *State v. Alcorn*, No. 24-0575, 2025 WL _____ (Iowa Ct. App. Dec. 3, 2025); *State v. Robert Lyons*, No. 24-0640, 2025 WL _____ (Iowa Ct. App. Dec. 3, 2025)

## II.     Analysis

### A. Did the district court err by instructing the jury on aiding and abetting?

Rebecca contends the State failed to offer enough proof of aiding and abetting to instruct the jury on that theory of liability.  We review for correction of errors at law.  *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013).  We begin with the aiding-and-abetting statute.

> All persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense or aid and abet its commission, shall be charged, tried and punished as principals. The guilt of a person who aids and abets the commission of a crime must be determined upon the facts which show the part the person had in it, and does not depend upon the degree of another person's guilt.

Iowa Code § 703.1 (2022).

We may uphold a conviction on an aiding-and-abetting theory if the record includes substantial evidence that "the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission."  *Neiderbach*, 837 N.W.2d. at 211 (citations omitted).  While knowledge of criminal activity is crucial, neither knowledge nor presence at the scene is enough—standing alone—to prove aiding and abetting.  *Id*.  But we will consider Rebecca's "presence, companionship, and conduct" before and after the commission of these offenses to decide whether it was proper to instruct the jury on aiding and abetting.  *See id*. (finding that such evidence is "enough from which to infer a defendant's participation in the crime").

In support of her contention, she quotes testimony from Des Moines police officer Chase Lohnes, the lead detective.  On cross-examination, counsel asked

the detective: "What evidence did you uncover that suggested John Alcorn, Ms. Lyons and Mr. Lyons got together and said, 'Here's what we're going to do. We're going to take these guys out." Detective Lohnes replied: "There is no evidence of that." The detective added, "There's no evidence to indicate that all three agreed upon anything."

But as the State notes, Detective Lohnes was not the factfinder. And while the record contained no direct evidence of an express agreement among the defendants, a wealth of circumstantial evidence justified instructing the jurors on aiding and abetting. *See State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (finding substantial evidence from which jurors could reasonably infer that Lewis aided and abetted the drive-by shooting).

It was undisputed that Rebecca was present at the house and in the company of her father and Alcorn before the shooting. In discussing Jerrel's impending arrival with Rebecca and Robert, Alcorn planted the seed that the visitors posed a violent threat. To that end, Robert told police that after Alcorn warned that Jerrel was on his way, they all thought "well, we've got guns too." And Robert placed the weaponry in accessible spots around the house. After Jerrel rang the doorbell and explained why he was there, Robert and Rebecca both showed him they were carrying weapons. Jerrel recoiled, saying he was unarmed. To which Rebecca replied: "We got M4s, we got AKs, we got everything. And we're ready to shoot up whoever comes over here." As the State argues on appeal, the jury could have viewed her reply as "putting her support behind their planned response to the situation."

Rebecca insists that when she fired seven rounds from her Ruger pistol out the window, she believed that the shooting had originated from Jerrel and his companions, and this belief negates an aiding-and-abetting jury instruction. But a fact finder was entitled to doubt the reasonableness, if not the sincerity, of that belief. As the third person to shoot from the house, Rebecca had heard Alcorn's initial volley, followed by the thirty rounds from Robert's Colt M4 Carbine, followed by Robert coming inside and firing five more .45-caliber shots from the window. After a two-minute break in the action, Rebecca contributed to the onslaught.

Then after the shooting, Rebecca joined in Robert's plan to mislead the police by insisting that the visitors shot first and Alcorn, Robert, and Rebecca returned fire. When viewed in total, Rebecca's presence, companionship, and conduct before and after the shooting support instructing the jury on Rebecca's liability as an aider and abetter. *See Neiderbach*, 837 N.W.2d at 211 (approving aiding-and-abetting instruction when defendants were both present when the offense was committed and "colluded with each other" to explain what happened).

## B. Did the district court rule on the weight of the evidence?

Rebecca seeks a new trial, contending the jury's verdicts were against the greater weight of the evidence. *See State v. Ellis*, 578 N.W.2d 655, 658–59 (Iowa 1998). Before reaching the merits of her claim, we must consider the State's error preservation argument. The State acknowledges that after the jury's verdicts, Rebecca moved for a new trial, alleging that those verdicts were contrary to the weight of the evidence. *See* Iowa R. Crim. P. 2.24(2)(b)(7). But the State contends error was not preserved because the district court did not rule on the weight-of-the-evidence question. As the State explains, "because the written motion

conflates weight and sufficiency, the district court ruled only there was sufficient evidence—it made no ruling on its weight. *See State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016) (outlining the difference between the sufficiency and weight standards)."

We agree that the district court blurred the sufficiency and weight standards. The court stated:

> With respect to sufficiency of the evidence, there was a great deal of evidence in the case, including the testimony from the defendants. Although that evidence may have been contradictory, the court does not re-evaluate the evidence and simply considers whether there is sufficient evidence to support the jury's verdict.

Trouble is, Rebecca does not recognize that the district court applied the wrong standard and does not ask for a remand for the court to apply the correct standard. Instead, she asks us to find that the district court abused its discretion and remand for a new trial. But we have nothing to review. The district court did not decide whether the evidence preponderated heavily against the verdict. *See State v. Nitcher*, 720 N.W.2d 547, 559–60 (Iowa 2006) (requiring independent evaluation of the evidence and determination of witness credibility). And our review does not extend to "the underlying question of whether the verdict is against the weight of the evidence." *Ary*, 877 N.W.2d at 707. On this record, we cannot consider the merits of Rebecca's weight-of-the-evidence challenge. *See State v. Parker*, No. 22-0491, 2023 WL 7391664, at *3 (Iowa Ct. App. Nov. 8, 2023) (finding error was not preserved when defendant did not receive a ruling on his weight-of-the-evidence challenge).

**AFFIRMED.**